Argued April 29, reversed August 5, 1976

GREEN et al, *Petitioners,*

*v.*

HAYWARD et al, *Respondents,*
BOHEMIA, INC., *Intervenor-Respondent
and Cross-Petitioner.*

552 P2d 815

*Vernon D. Gleaves,* Eugene, argued the cause for petitioners and cross-petitioner. With him on the briefs were Thomas M. Allen and Butler, Husk & Gleaves, Eugene, and Howard M. Feuerstein, Stephen T. Janik and Davies, Biggs, Strayer, Stoel and Boley, Portland.

*Robert E. Stacey, Jr.,* Portland, argued the cause for respondents and filed a brief amicus curiae for 1000 Friends of Oregon. Also on the briefs were Larry D. Thomson, Joseph J. Leahy and Howard D. Ollis of Office of Legal Counsel, Eugene, and George J. Woodrich of Thompson, Mumford, Woodrich & Anderson, Eugene.

Before O'Connell,* Chief Justice, and Denecke,** Holman, Tongue, Howell and Bryson, Justices.

(For Court of Appeals opinion, see 23 Or App 310)

O'CONNELL, J.

---

*Chief Justice when case was argued.
**Chief Justice when case was decided.

## O'CONNELL, J.

This case comes to us on a petition for review from the Court of Appeals, which held invalid two orders of the Lane County Board of County Commissioners, one rezoning a 50-acre tract of land owned by Bohemia, Inc., and the other declaring the Board's intent to rezone an adjacent 90-acre parcel upon which Bohemia held an option to purchase.[1] That option has since been exercised. We granted review because the case raises significant questions concerning judicial review of local government rezoning determinations in light of our decisions in *Fasano v. Washington Co. Comm.,* 264 Or 574, 507 P2d 23 (1973) and *Baker v. City of Milwaukie,* 271 Or 500, 533 P2d 772 (1975).

The two parcels lie approximately two miles north of the City of Coburg, and were zoned AGT (agricultural, grazing and timber raising) in 1966. At that time there was a veneer plant in operation on the 50-acre parcel. That plant continued in operation as a non-conforming use, and was purchased by Bohemia in 1972.

Also in 1972 the Lane County Board of County Commissioners adopted the "Eugene-Springfield Metropolitan Area 1990 General Plan," a document which

"* * * consists of statements of goals and recommendations and accompanying illustrations to guide the development of the metropolitan area. The plan indicates how the various elements of the metropolitan community can be developed in order to attain the compact growth form consistent with achievement of the General Plan goals."[2]

The text of the 1990 Plan does not indicate the precise

---

[1] The "declaration of intent to rezone" is apparently a procedure sanctioned by the Lane County zoning ordinances by which the Board commits itself to a later rezoning provided the applicant submits detailed plans which meet with the Board's approval. See *Green v. Hayward,* 23 Or App 310, 542 P2d 144 (1975) at note 1. For purposes of this opinion we will refer generally to the two orders of the Board as "rezoning" decisions.

[2] Eugene-Springfield Metropolitan Area 1990 General Plan ["1990 Plan"] at p. 5.

geographic area of its coverage. There are frequent references to the "metropolitan area," the "metropolitan community" and the "outlying" or "satellite" communities. None of these terms is defined in the Plan, but Coburg is described as one of the satellite communities.

In 1973 Bohemia applied for a rezoning of its mill site, and also of the 90 acres lying immediately north of the mill, from AGT to M-3 (heavy industrial). The rezoning was requested in part because Bohemia needed to expand its existing facilities to provide increased space for log storage and improved sewage disposal capacity in connection with its current activities, and in part because Bohemia wished to construct a bark-processing plant where it could utilize a new process which it had developed for converting bark, which was a waste product of its mill operations, into saleable products.

Bohemia's rezoning requests were opposed by a number of residents of the area. After notice and public hearing, the Board of County Commissioners made its decisions in favor of Bohemia's requests. Some of the opponents then applied to the circuit court for a writ of review of the Board's action on the ground, among others, that the zone changes did not conform to the 1990 Plan. Bohemia was made a party by intervention and, after appropriate proceedings, the circuit court entered judgment affirming the action of the Board.

The Court of Appeals, citing *Baker v. City of Milwaukie,* 271 Or 500, 533 P2d 772 (1975), held that the zone change was invalid because it failed in two respects to comply with the 1990 Plan. In the first place, the court held,

"* * * The plan designates that the tracts of land in controversy are for agricultural use only. Zoning ordinances allowing the much more intensive industrial use manifestly do not comply with that designation." 23 Or App at 318, 542 P2d at 148.

Apparently the Court of Appeals found the designation of these tracts for agricultural use on the "Metropolitan Area Plan Diagram" which is a part of the 1990 Plan. That diagram uses color designations to indicate different types of land uses. All of the land surrounding the City of Coburg, from the Willamette River on the west and south to the foothill area on the east, and extending northward as far as the map shows, is colored brown. According to the key provided with the diagram, brown means:

"AGRICULTURAL—Primarily reserved for agriculture and related activities, some localized areas within may be considered as 'rural' provided they do not conflict with adjoining agricultural uses."[3]

Industrial areas are colored magenta. An "Industrial" designation on the diagram means, according to the key, "Major centers for manufacturing, warehousing, and wholesaling." The industrial areas shown on the diagram are all approximately four miles or more from these tracts. A note to the diagram key, however, states:

"In interpreting proposals shown on this plan diagram, it is necessary to refer to the findings, goals, objectives, recommendations and descriptive analyses contained in the text to gain a complete understanding of the General Plan."

Moreover, that portion of the text which introduces the diagram refers to it as "illustrative" and points out that the diagram does not include all detailed land use specifications.[4] If the opinion of the Court of Appeals

---

[3] According to the key, a "rural" designation means: "General agriculture, open space, woodland, rural residential (average parcel size of five acres or greater based on development patterns, soil types and other natural conditions). Urban level of service not likely within the current planning period. Portions of these areas may also provide needed space for urban development after 1990 or sooner in the event that urban growth occurs at a faster rate than projected."

[4] Finally, note that the plan does not offer detailed proposals related to neighborhood and community facilities. Such proposals properly belong in more detailed community and area plans. The emphasis of this metropolitan area General Plan is on the broad allocation of land for urban use." 1990 Plan at p. 17.

reflects or creates an understanding that our decision in *Baker v. City of Milwaukie, supra,* was intended to hold that a local government's zoning map must coincide in detail with the map portion of the comprehensive plan, that misunderstanding should be corrected. In *Baker* this court did not have to interpret or apply a comprehensive plan. That case was before us for review of the dismissal of a writ of mandamus. The writ alleged, in essence, that the city had adopted a comprehensive plan, but that for a period exceeding three years had taken no steps to amend the zoning ordinances to conform to the plan, and was proceeding under pre-existing inconsistent ordinances to grant building permits for development more intensive than permitted by the plan. The city's defense in that case was that it had no obligation to conform its zoning to the plan. In effect, it admitted the allegations that the zoning ordinances and building permits were in violation of the plan. Upon that record, we concluded:

> "* * * Upon passage of a comprehensive plan a city assumes a responsibility to effectuate that plan and conform prior conflicting zoning ordinances to it. We further hold that the zoning decisions of a city must be in accord with that plan and a zoning ordinance which allows a more intensive use than that prescribed in the plan must fail." 271 Or at 514.

We were not called upon to determine, nor did we attempt to do so, whether the zoning was, in fact, inconsistent with the plan, or the form in which a comprehensive plan should prescribe permissible uses of land. *Baker* does not hold that a diagram or map which constitutes a part of a comprehensive plan is necessarily the controlling land use document.

At times relevant to this case, Oregon law did not prescribe the format of the comprehensive plan.[5] In fact, there is as yet no agreement within the planning

---

[5] ORS 215.050, prior to its amendment in 1973, provided: "The commission shall adopt and may from time to time revise a comprehensive plan for the use of some or all of the land in the county, The plan may be adopted and revised part by part."

profession as to the form which a good comprehensive plan should take.[6]

The 1973 legislature did address the question with a statutory definition of a comprehensive plan. Although not directly applicable to this controversy, that statute illustrates that even a very recent legislative definition does not attempt to describe the plan format in detail. Although it calls for both a map and a policy statement, the statute addresses primarily questions of content, leaving the problem of form to those responsible for the creation and adoption of the plan. ORS 197.015(4).[7] In light of the freedom given

[6] *See, e.g.,* Plager, "The Planning Land-Use Control Relationship: A Look at Some Alternatives," *Land-Use Controls Q.,* 26, 28 (Winter 1969) quoted in Hagman, *Public Planning and Control of Urban and Land Development* (1973) at 337:

"* * * The understanding in the profession ranges along a continuum with, at the one end, a plan that must appear in mapped form, to, at the other end, the policies plan that does not use maps at all. * * * [T]he problem of determining 'accordness' is a difficult one and is related to the problem of what a plan is. To the extent that the plan itself is a detailed map of the land indicating specific uses, it differs hardly at all from the zoning map itself. Under these circumstances, while it is possible to measure 'accordness' with some degree of accuracy, the plan becomes rigid and of little use in dealing with dynamic community growth. The planners generally reject such an interpretation of what a comprehensive plan is. If on the other hand the plan is displayed graphically as large blobs of bright colors with no clear boundary lines—sort of a planner's Rorschach test—the decision-making process finds little to aid it in dealing with specific land uses at the edge of the blobs. And as one gets away from graphics altogether and into the area of broad policy statements, the plan provides even less by way of guidelines for specific land-use decisions * * *."

[7] "'Comprehensive plan' means a generalized coordinated land use map and policy statement of the governing body of a state agency, city, county or special district that interrelates all functions and natural systems and activities relating to the use of lands, including but not limited to sewer and water systems, transportation systems, educational systems, recreational facilities, and natural resources and air and water quality management programs. 'Comprehensive' means all-inclusive, both in terms of the geographic area covered and functional and natural activities and systems occuring in the area covered by the plan. 'General nature' means a summary of policies and proposals in broad categories and does not necessarily indicate specific locations of any area, activity or use. A plan is 'coordinated' when the needs of all levels of governments, semipublic and private agencies and the citizens of Oregon have been considered and accommodated as much as possible. 'Land' includes water, both surface and subsurface, and the air."

local governments, both in the past and for the future, to design the form of their comprehensive plans, we refrain from statements of general application about how such plans are to be read or interpreted. The relationship between the text and the maps within a particular plan must be determined from the plan document itself, considered as a whole.

In the present case, the Plan itself tells us that neither the text nor the illustrative diagram was intended to provide advance answers to the kinds of questions involved in this case.[8] We conclude that in the 1990 Plan, the plan map or diagram was intended to illustrate what the text calls the "broad allocation" of land within the area shown, but not to put a limit on the permissible uses of each and every tract within that area.[9] In order to determine whether a particular zoning decision is in compliance with the Plan, we must look to other portions of the Plan in addition to the diagram.

One of the central policies of the Plan is that of discouraging urban sprawl by implementing a "compact growth pattern" for the Eugene-Springfield metropolitan area. By implementing such a pattern, the

---

[8]The notes to the diagram refer the reader to the text for a complete understanding of the "proposals" shown on the diagram. The text, in the Introduction, says:

"In terms of form, the General Plan is not a zoning ordinance or a blueprint for the specific development of particular buildings, highways and so on. Such specific recommendations would soon be outdated. Instead, the General Plan presents a number of broad development guidelines. Some specific details are provided, but they serve as illustrative examples as possible applications of the guideline policies rather than as fixed decisions. The policies can be applied to individual projects or area plans conceived by local government agencies or private developers. In other words, the General Plan, which is long-range, comprehensive and focused on physical development, provides a flexible guide for specific development decision making. It does not, in itself, set down the decisions." 1990 Plan at p. 2.

[9]In addition to the text of the Plan, we find further support for this conclusion in the fact that the diagram contains many large single-color areas which appear to be undifferentiated as to uses. Moreover, counsel agreed at oral argument that the Coburg Industrial Park is not shown on the diagram as an industrial area.

plan aims to achieve the following objectives:

(1) "Preservation of prime, agricultural land from urban development.

(2) "Elimination of urban development in the flood plain area.

(3) "Reduction of scatteration and urban sprawl.

(4) "Reduction of the amount of public utilities which will not be used efficiently for many years.

(5) "Encouragement of development of vacant land where services are available thus capitalizing on the public expenditures already made for these services.

(6) "Shaping and regulating urban form and growth and preservation of the special character of the area.

(7) "Protection of open space.

(8) "Minimize the need for more outer beltline roads.

(9) "Making urban mass transit more economically feasible thus lessening the need for an auto-dominated transportation system." 1990 Plan at p. 11.

The Court of Appeals held that the rezoning in this case failed to conform to the Plan because it "notably failed to comply with several essential objectives of the plan's design for growth," specifying objectives (1), (3), (5) and (6) as quoted above. 23 Or App at 318, 542 P2d at 148.

As to objective (1), Commissioner Elliott expressly found that the land involved was not prime agricultural land, and Commissioner Omlid found:

"Soil ranges from good to poor, therefore it is difficult to class that as essentially prime agricultural land."

The evidence before the Board relating to the suitability of the land for agriculture was conflicting, but there was substantial evidence to support the above findings and the Court of Appeals was therefore bound by them.[10] As to objectives (3), (5) and (6), The statement of the Court of Appeals appears to be accurate. However, the Plan contains other policy statements with which the rezoning decisions can reasonably be

---

[10]The proper scope of judicial review is discussed at greater length later in this opinion.

said to be consistent. Commissioner Omlid made the following findings:

"The Plant expansion itself will contribute to the attainment of goals cited in the 1990 Plan in that it will:

"Enhance the economic health of a small rural community.

The production process brings a greater utilization of our basic industrial resource.

The process will aid in enhancing our environment by using that part of the resource that must now be burned or put into the sanitary landfills or somehow gotten rid of.

The traffic problem which presently exists is more likely to be alleviated than aggravated.

The lagoons for waste treatment and the drainage system proposed around the area will be an important improvement over what presently exists."

And Commissioner Elliott made the following finding, among others:

"The Coburg City Council and the Coburg Planning Commission has [sic] recommended approval. The 1990 Plan suggests that satellite communities should develop on a balance basis."

The Board has thus found that the rezoning would further some of the objectives of the Plan. The Court of Appeals has concluded that other important objectives would be violated by this rezoning decision. Both conclusions find some support in the record of the hearing before the Board.

■ When proceeding on a writ of review, the role of the court is to determine whether the order under scrutiny is supported by substantial evidence. See *Western Amusement v. Springfield,* 274 Or 37, 40, 545 P2d 592 (1976). In *Western Amusement* we pointed out, however, that the "substantial evidence rule" is, in reality, a variable rule. Its meaning depends to some extent upon the context in which it is applied. That case involved the question whether the city's determination that petitioner's property was benefited by a street, and therefore subject to assessment for the

street's construction, was adequately supported by the record. In that context, we said:

"In *Roseta v. County of Washington,* 254 Or 161, 166-168, 458 P2d 405, 40 ALR3d 364 (1969), we observed that the judiciary entered into the zone change process because of the record of zone changes being granted because of special privilege or without regard to the effect of the zone change on the overall plan for land use. We are not aware of any record of substantial legislative deficiency in the area of special assessments.

"* * * * *

"We consider our authority to be that in determinimg whether the city council's action is supported by substantial evidence we can consider the long and well-founded policy of judicial restraint in this area." 274 Or at 42-43.

In the present case we are concerned with the very process referred to in *Roseta,* and the concerns which were expressed in that case were a significant factor in our decision in *Fasano.*[11] In that case we described the burden of proof to be borne by the proponent of a zoning change and a resulting enlarged scope of review on appeal. 264 Or at 586-87. In view of our past policy, as expressed in *Roseta* and *Fasano,* it is clear that judicial review in zone change cases need not involve the same degree of restraint as that approved for special assessment cases in *Western Amusement.*

The record contains substantial evidence to support the specific findings of Commissioners Omlid and Elliott which are quoted above. The more difficult question is whether the findings and the evidence are sufficient to support the rezoning decisions themselves. As we have noted, the Plan contains a number of goals, objectives, and recommendations, stated in general terms. We are reluctant to hold that one or a few of those general statements may be severed from the Plan as a whole and used in isolation as justification for a rezoning decision. To hold that a zoning amendment is placed beyond judicial review by a find-

---

[11] See, especially, *Fasano v. Washington Co. Comm.,* 264 Or at 580-81 and 587-88, 507 P2d 23 (1973).

ing, supported by substantial evidence, that the rezoning furthers *some* policy in the comprehensive plan would place these decisions beyond the reach of meaningful judicial scrutiny. Nearly every individual zoning decision could reasonably be said to conform to or support one or more of the generally-stated goals or objectives in a typical modern comprehensive plan. On the other hand, we are not authorized, and do not wish, to prescribe de novo court review of these decisions on the merits. The proper concern of the courts in these cases is to ascertain whether adequate procedures were followed and proper legal standards were applied. The difficulty in this case arises because we have not been provided with an adequate statement of the reasons for the decisions of the Board — a statement which would have informed us of the portions of the Plan which the Board considered relevant and the reasons why a zone change which is consistent with some of the Plan's goals but violates others is considered to be in compliance with the Plan.

Moreover, we find in the Plan a set of "minimum location standards for industrial parks, research, and development, and other restrictive industrial development in areas not otherwise shown for industrial development in the '1990 General Plan Diagram' * * *." These minimum standards are quoted in the margin.[12] There is, however, nothing in the record, the

---

[12]

"a. Access to an arterial road is immediately available without the generation of traffic through areas planned for residential use.

"b. Sufficient natural or man-made features exist or can be provided in the development process so as to otherwise insure compatability with adjacent areas, considering, among other factors: (1) prevailing winds; (2) noise, water, and air pollution; (3) physical character of the proposed development, such as off-street parking facilities; openness and attractiveness of the setting; bulk, height, and setting of structure; landscaping; (4) natural hazards such as flooding, drainage and geological conditions.

"c. Those utilities and services necessary for the category of industrial development are available or planned for the site (and for other adjacent sites of the same characteristics and

findings, or the decision to indicate why these standards were not expressly applied. We do not know whether the Board considered them inapplicable to this type of industrial development, considered them advisory only because they are cast in the form of a "recommendation," believed all the standards were met, or simply overlooked them.

■ As we find these "minimum standards" to be the only specific guidance given by the Plan for the decision to permit industry in areas not designated industrial on the diagram, and as there has been no showing that the standards are not applicable to this case, a showing of conformity to the Plan requires a showing that these standards have been met. The findings and order of the Board are far from clear on this point. We realize that the public hearing on Bohemia's requests took place not long after the publication of the *Fasano* decision, and that the Board was justifiably uncertain about the procedures which it was required by that decision to observe. Finding itself in the unfamiliar situation of conducting a hearing on the record, in light of *Fasano's* rather general procedural admonitions, the Board made considerable and commendable efforts to assure fairness and a proper hearing, aided by the advice of counsel. Because we are convinced that the parties were afforded a fair hearing and that the Board conscientiously addressed itself to the underlying problems of public policy in reaching its decision on Bohemia's requests, we have examined the record to determine whether its decision could reasonably have been based on substantial evidence that the minimum locational standards, specified in the Plan, were met.

logical for the same type of development) without creating: (1) excessive burdens on such services, (2) the lowering of service levels in the general vicinity, or (3) excessive or unreasonable financial burdens on other properties in the general vicinity.

"d. Use of the area for non-residential purposes would not disrupt the continuity of a neighborhood or community (such as the utilization of land planned for residential development to the extent that an existing or planned school facility for the area would be under-utilized or could not be justified.)"

■ ■   We are, however, unwilling to make this a practice. The appropriate place for both an initial interpretation of a comprehensive plan and a determination whether a proposed change complies with the specifics of the plan as properly interpreted is at the local level where the governing body is familiar with the plan and its implementation, and has heard the evidence at first hand. The chances of misunderstanding and of inconsistent land-use decisions are greatly enhanced when the courts are forced, because of inadequacies in the record, to undertake a search for evidence to support findings which were not made and reasons which were not given. Judicial review in these cases should be limited to a consideration of whether a properly documented decision finds support in the record. If necessary in the future, we would be justified in returning cases such as this to the local body for a complete statement of the basis for the decision.

In this type of case, involving what we characterized in *Fasano* as the exercise of judicial or quasi-judicial, rather than legislative, authority by the local governing body, the following observations about judicial review of administrative decisions are pertinent:

> "The practical reasons for requiring administrative findings are so powerful that the requirement has been imposed with remarkable uniformity by virtually all federal and state courts, irrespective of a statutory requirement. The reasons have to do with facilitating judicial review, avoiding usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearings and judicial review, and keeping agencies within their jurisdiction." 2 Davis, *Administrative Law Treatise* 444, § 16.05.

These "practical reasons" seem to us equally compelling when we consider the need for a statement of reasons. As the same author has noted, the courts have tended increasingly to require such a statement from administrative agencies, even in the absence of a statutory requirement. 2 Davis, *Administrative Law Treatise* § 16.12 and 1970 Supp. at 579-587. In *Roseta*

*v. County of Washington, supra* 254 Or at 170, n. 8, we held that the Board's burden of proving that a rezoning was consistent with the comprehensive plan had not been met where the record did not contain adequate findings. As we indicated there, we were concerned not only with findings of fact, but with the Board's reasons for its decision.

Our Court of Appeals, in an opinion by Chief Judge Schwab, has called for reasoned administrative decisions in the following language, with which we agree:

> "If there is to be any meaningful judicial scrutiny of the activities of an administrative agency—not for the purpose of substituting judicial judgment for administrative judgment but for the purpose of requiring the administrative agency to demonstrate that it has applied the critera prescribed by statute and by its own regulations and has not acted arbitrarily or on an ad hoc basis—we must require that its order clearly and precisely state what it found to be the facts and fully explain why those facts lead it to the decision it makes. Brevity is not always a virtue. The less circumscribed an agency is by the legislative grant of power to it and by its own regulations augmenting that grant, the more detailed and precise its explanation of its actions exercising the powers granted to it must be." *The Home Plate, Inc. v. OLCC,* 20 Or App 188, 530 P2d 862, 863 (1975).

Judge Bazelon has spoken to the same question in the zoning context:

> "The case for requiring a statement of reasons from an administrative agency is a persuasive one. Those reasons may be crucial in order for the court to know what the agency has really determined, hence what to review. Courts ought not to have to speculate as to the basis for an administrative agency's conclusions; nor can a court assume without explanation that proper standards are implicit in every act of agency discretion. * * * Finally, the articulation of reasons by an agency—for itself and for the public—does afford a safeguard against arbitrary and careless action and is apt to result in greater consistency in an agency's decision making." *Citizens Ass'n. of Georgetown, Inc. v. Zoning Com'n. of D.C.,* 477 F2d 402, 408 (D C Cir 1973).

To these observations we would add that judicial review of local government's rezoning decisions without the assistance of a statement of reasons subjects the local government to the risk that the court will interpret its plans, ordinances, or policies in a way in which they were not intended. A complete statement of the basis for a decision like this one would minimize the chances of inadvertent misinterpretation by providing the courts with the benefits of the Board's experience in the interpretation and implementation of its plan.

■ With some misgivings on these grounds we have, nevertheless, examined the record to determine whether the evidence will support the Board's decision to rezone. There is evidence in the record before the Board which would support findings that: (1) the proposed facility, by enabling Bohemia to utilize a waste product on the site, would reduce traffic problems rather than generate additional traffic;[13] (2) the "intent to rezone" procedure, together with permit requirements of other agencies, will insure compatability of Bohemia's expansion with adjacent areas; (3) no additional utilities and services will have to be provided; and (4) because of its association with an existing industrial facility, the new plant would not disrupt the continuity of a neighborhood or community. Although much of this evidence was controverted, a determination by the Board that the minimum location standards were met would not be arbitrary.

In *Fasano,* discussing the burden of proof to be carried by the proponent of a rezoning request, we said:

"* * * If other areas have previously been designated for the particular type of development, it must be shown why it is necessary to introduce it into an area not previously contemplated and why the property owners there should bear the burden of the departure." 264 Or at 586.

It is contended that there was no showing of necessity for change in this case, as much of the land in Lane

[13]Commissioner Omlid did make a finding to this effect.

[ 708 ]

County which had been previously zoned for heavy industrial development had not been used for that purpose. It is also argued that Bohemia's desire to build its new plant on land which it already owned (or had an option to purchase) was not a proper consideration. Ordinarily this argument would carry considerable weight. The integrity of comprehensive planning would be seriously compromised if a property owner could obtain a zone change on the ground that he did not own any of the land that was already zoned for the type of development he had in mind, or that his proposed development would be less profitable in an appropriately zoned area. In this case, however, there was evidence before the Board that the new plant was to utilize a process which had been developed by Bohemia, that the plant, to be economically feasible, had to be constructed close to an existing mill, and that it was in the public interest as well as in the interest of Bohemia to permit the construction of such a plant in order to utilize the quantities of old-growth bark which would otherwise constitute a solid-waste disposal problem. The Board could reasonably have concluded that if the plant were not built adjacent to Bohemia's existing mill, no such plant would be built within the county, and that it was in the public interest to have such a plant constructed. We think the record is adequate to support a finding of necessity for the zoning changes.

As we have found the record adequate to support the Board's decisions, we do not need to reach petitioner's contention that the 1990 Plan was not a legally sufficient comprehensive plan for the Coburg area. Assuming that the Plan is legally sufficient, the Board was justified in concluding that the rezoning was in conformance with the Plan.

The decision of the Court of Appeals is reversed, and the judgment of the circuit court is reinstated.