Argued July 26, affirmed December 13, 1976, reconsideration denied by opinion January 31, petition for review allowed May 24, 1977
See later volume of Oregon Reports

SOUTH OF SUNNYSIDE NEIGHBORHOOD
LEAGUE et al, *Appellants,*

*v.*

BOARD OF COMMISSIONERS OF CLACKAMAS
COUNTY et al, *Respondents.*

(No. 91837, CA 5784)

557 P2d 1375

[ 648-a ]

*Louis J. Fasano,* Portland, argued the cause for appellants South of Sunnyside Neighborhood League; Thomas M. and Florence Baggs; Vance A. and Patricia J. Higdon; Charles M. and Sharon L. Foidel; Fred R. and Wilma J. Heyne; Scott L. and Kitty Freeman; Frank H. and Valerie J. Temple.

*Gregory R. Mowe,* Portland, argued the cause for appellants First Union Real Estate Equity and Mortgage Investment; First Union Management Co., Inc., dba First Union Shopping Centers Co.

*Lawrence R. Lucas, Jr.,* Portland, argued the cause for appellants Oregon Environmental Council and Northwest Environmental Defense Center.

With them on the briefs was Clarence R. Wicks, Portland.

*Richard F. Crist,* Deputy District Attorney, Oregon City, argued the cause for respondents Board of Commissioners of Clackamas County, Oregon, and its members, Thomas D. Telford, Robert Schumacher, Stan Skoko; Clackamas County Planning Commission, and its members, Daniel Baer, George Lyons, Una Schmidt, John Dodd, Peter McDonald, Fred Wickersham, David McMinn, and Gerald Rothenfluch. With him on the brief was Roger Rook, District Attorney, Oregon City.

*Theodore B. Jensen,* Portland, argued the cause for respondents Ernest W. Hahn, Inc.; The Coldwell Banker Fund; Broadway-Hale Properties, Inc. (or Carter Hawley Hale Properties, Inc.). With him on the

brief were Alan K. Brickley, and Jensen, DeFrancq, Holmes & Schulte, Portland.

Before Schwab, Chief Judge, and Fort and Thornton, Judges.

SCHWAB, C. J.

## SCHWAB, C. J.

In this writ of review proceeding, plaintiffs appeal from a circuit court order affirming a Clackamas County Board of County Commissioners' decision to amend the county's comprehensive plan as it relates to a single parcel of approximately 65 acres. The amendment in question, which changes the use designation of this parcel from Medium Density Residential to Planned Commercial, was sought by defendant Ernest W. Hahn, Inc. (Hahn), as a preliminary step in the development of the Clackamas Town Center (Town Center), a 115-acre hotel and shopping center complex.[1]

In May 1974, the county had a temporary plan called the "development pattern." The development pattern served while the present comprehensive plan was being formulated—a task which began in 1969. Two development-pattern use designations applied to the 115 acres in question: 50 acres were designated "commercial" and 65 were designated "low density residential." On May 21, 1974, Hahn applied to the county planning commission to have these development-pattern designations changed to "planned commercial."[2] Before action could be taken on the Hahn applications, the board of county commissioners replaced the development pattern by adopting the

---

[1] The proposed Town Center would occupy approximately 115 acres— the 65 acres in question and a contiguous 50 acres already designated for planned commercial use. Facilities such as the Town Center are frequently referred to as regional shopping centers or "regionals." Such centers draw business from and have an impact on large areas known as "trade areas." The Town Center's trade area is conceded to include much of the Portland metropolitan area.

The parties also agree that, with one possible exception, the Town Center will be the largest facility of its type in the state. While estimates regarding exact size vary, the center is projected to contain six department stores, a 200-room hotel-and-convention facility, two office buildings, an ice rink, a theater and some 500,000 square feet of additional space for shops and community facilitites.

[2] The planning commission is charged with evaluating applications for comprehensive plan amendments. The commission had first been apprised of the Hahn proposal in December 1973.

Clackamas County Comprehensive Plan.[3] The new comprehensive plan redesignated the 50-acre "commercial" parcel "planned commercial"; the 65-acre "low density residential" parcel was redesignated "medium density residential." Accordingly, Hahn reapplied to the planning commission in an effort to have the comprehensive plan amended so that the 65-acre parcel would have the same "planned commercial" designation as the 50-acre parcel.

After hearings the planning commission voted, on December 2, 1974, to recommend to the board of county commissioners that the requested amendment be approved. The board conducted hearings regarding the proposed amendment in January 1975, and thereafter voted to amend the comprehensive plan's designation for the 65 acres to "planned commercial." The circuit court upheld the board's action and this appeal followed.[4]

■ The scope of the plaintiffs' brief exceeds the scope of their petition for writ of review. However, this court "cannot consider any errors except those disclosed by the petition." *Kinney v. City of Astoria,* 58 Or 186, 189, 113 P 21 (1911). Those assignments of error in the brief which we do consider, because they are based on issues raised by the petition, can be grouped into four general categories:

(1) That, under *Tierney v. Duris, Pay Less Properties,* 21 Or App 613, 536 P2d 435 (1975), the board had no authority to amend the comprehensive plan;

---

[3] The plan had been completed by the planning commission and forwarded to the board of county commissioners for adoption in January 1974.

[4] Appellants also petitioned LCDC for review of the amendment in question. The LCDC order regarding the matter, dated July 2, 1976, is outside the record before us on this writ of review.

After the amendment to the comprehensive plan was approved the Hahn interests applied for and obtained on November 24, 1975, a new zone classification of "planned commercial" for the 65-acre parcel.

(2) That, assuming, arguendo, it has such authority, the board did not apply the proper legal standards in making its decision;

(3) That, in any event, the board did not follow proper procedures; and

(4) That the board's decision was not supported by substantial evidence. Here, we note only that there was ample evidence to support each of the board's findings, and see no purpose to be served by further discussion of this issue.

## I. THE BOARD'S AUTHORITY

We first considered the extent of a local government's authority to amend its comprehensive plan in *Tierney v. Duris, Pay Less Properties, supra.* In *Tierney* we held that a city was authorized to amend its comprehensive plan and change the use designation of an eight-acre parcel from residential to commercial. The basis for this result is straightforward: the provisions of the comprehensive plan in question stated that amendment was authorized. In dictum we added that, even without express authorization,

> "* * * [w]e see no virtue to a rule [assuming that such a rule is statutorily or constitutionally feasible] that would prohibit comprehensive plan changes. While we need not here decide the ultimate limits of authority to make such changes, at the least changes would appear permissible when the original plan was in error, or there has been a change in the community, or there has been a change in policy, such as could be produced by city and county election results." 21 Or App at 621.

Plaintiffs have seized this dictum and argued that in the six months between adoption of the comprehensive plan and its amendment, no community or policy changes occurred sufficient to confer authority to amend. It is also claimed that no errors in the plan exist which justify a change.

Plaintiffs' argument is untenable. The county's comprehensive plan contains the following express

authority to amend the plan as needed, as well as procedures for adopting such amendments.

"AMENDMENTS

"It will be necessary to amend and update this Comprehensive Plan in limited areas. These amendments are to be considered major changes and shall be reviewed at legal public hearings.

"Amendments to the Comprehensive Plan shall be made pursuant to the following procedure:

"[1] An amendment may be initiated by a private individual, a community, neighborhood, or the county.

"[2] Upon consideration of a proposed amendment, the over-all area shall be considered and not just an individual parcel.

"[3] Prior to the Planning Commission hearing the matter, the Comprehensive Plan Committee of the Planning Commission shall review the proposal and make a report to the total Planning Commission on the matter.

■ At the public hearings before the Planning Commission, the Committee's report shall be considered. It shall take five (5) members of the Planning Commission, voting in favor of the proposal, to recommend to the Board of County Commissioners that the Plan be amended.

"* * * * *."

Even in the absence of such provisions, *Tierney* would not prohibit the action the board took here. Our decisions have consistently acknowledged that land-use planning must be a continuing process if it is to be responsive to community needs. *Tierney* holds that a local government may amend its comprehensive plan whenever it decides that amendment will best serve the public interest. Such a decision could occur even in the absence of changed conditions, errors in the original plan, or policy changes due to local elections. If reevaluation of previously considered factors lead the very officials who initially adopted a comprehensive plan to change their views regarding public need, we see no basis for a judicial declaration that conform-

ing the comprehensive plan to the new insights is not authorized.

## II. THE PROPER LEGAL STANDARDS

In *Green v. Hayward,* 275 Or 693, 552 P2d 815 (1976), a case dealing with a zone change, it is stated that "[t]he proper concern of the courts * * * is to ascertain whether adequate procedures were followed and proper legal standards were applied." 275 Or at 704.

We are here confronted with a plan amendment, and the same determinations must be made. In the context of a plan change, the applicable legal standard is prescribed by statute in the form of planning goals. *See* ORS 197.280 and ORS 215.515.[5] The board applied the proper legal standard if it considered and complied with, insofar as they were relevant, the following goals:

"* * * Goals for comprehensive planning are:

"(a) To preserve the quality of the air, water and land resources of the state.

"(b) To conserve open space and protect natural and scenic resources.

"(c) To provide for the recreational needs of citizens of the state and visitors.

"(d) To conserve prime farm lands for the production of crops.

"(e) To provide for an orderly and efficient transition from rural to urban land use.

"(f) To protect life and property in areas subject to floods, landslides and other natural disasters.

"(g) To provide and encourage a safe, convenient and economic transportation system including all modes of transportation: Air, water, rail, highway and mass

---

[5] ORS 197.280 provided for interim goals while the Land Conservation and Development Commission (LCDC) prepared Statewide Goals and Guidelines as required by ORS 197.225. LCDC's statewide goals replaced the interim goals on January 1, 1975, but compliance with the statewide goals was not mandatory until January 1, 1976. *See* ORS 197.250. The plan amendment in question was approved by the board in March 1975.

transit, and recognizing differences in the social costs in the various modes of transportation.

"(h) To develop a timely, orderly and efficient arrangement of public facilities and services to serve as a framework for urban and rural development.

"(i) To diversify and improve the economy of the state.

"(j) To ensure that the development of properties within the state is commensurate with the character and the physical limitations of the land.

"* * * * *." ORS 215.515.

■■ Comprehensive plan amendments need not serve the ends of each and every applicable planning goal. Indeed, *Green* implicitly acknowledges that it is normally impossible to subserve all goals because any list of planning goals will contain a variety of sometimes-inconsistent land-use objectives.[6] *See* 275 Or at 704. Compliance is achieved if local governments can adequately demonstrate that an amendment results in a plan which considers and accommodates as much as possible all applicable planning goals.[7] *Cf.* ORS 197.015(4).

■ This means that the criteria that apply when a plan is adopted also apply when a plan is amended, and that the proper legal standard is the same for both actions. This identity of standards insures that cohesive, well-integrated plans for the coordination of land uses are not deprived of their harmony by amendments based on narrow considerations. This point is reflected in one writer's observation that "any valid plan change must consider the same macrocosmic considerations as the document it amends." *Judicial Developments 1975— Land Use,* 55 Or L Rev 400, 405 (1976) (footnote omitted).

---

[6] For instance, goal (b) encourages open space and goal (i) arguably encourages industrial development. We note here that some goals may be irrelevant to a given land-use decision. In such cases, the goal in question would not be part of the criteria constituting the applicable legal standard.

[7] Compliance with the applicable goals is a substantive legal requirement, but the process of demonstrating compliance via adequate findings is a procedural matter which is discussed below.

■ As has been seen, land-use decision making is a process of balancing various considerations so that the land-use scheme as much as feasible accommodates each goal in a coordinated manner. Because it is for local governments to make subjective assessments of public need based on this balancing process, *Fasano's* two-part standard regarding (1) public need and (2) the best means of serving that need will ordinarily not operate independently of the legislature's standard for a plan change.[8] In a case such as we have here, *Fasano's* minimum standard is just a manner of stating what would be disclosed if an application of proper legal standards results in a decision that a given land use is desirable. This is not to say that the *Fasano* standard would not be independently significant in a case where few, if any, of the particularized planning goals are relevant. However, this is not such a case.

■ In this case, plaintiffs make two contentions regarding the board's alleged failure to apply proper legal standards; first, that the board failed to "consider or evaluate the costs or social, environmental and economic impacts of public improvements and of secondary private developments that will be necessitated by implementation of the applicants' proposal"; and second, that the board did not consider "the over-all area."

The first contention is analogous to the "blunderbuss assertion" we disapproved in *Kristensen v. Eugene Planning Com.,* 24 Or App 131, 134, 544 P2d 591 (1976). We assume plaintiffs' position is that the board did not consider criteria relating to the environment (interim goals (a) and (b), supra), the economy (interim goal (i), supra) and social needs (interim goal

---

[8] *Fasano v. Washington Co. Comm.,* 264 Or 574, 507 P2d 23 (1973) states:

"In proving that the change is in conformance with the comprehensive plan in this case, the proof, at a minimum, should show (1) there is a public need for a change of the kind in question, and (2) that need will be best served by changing the classification of the particular piece of property in question * * *." 264 Or at 583-84.

[ 655 ]

(e), supra). Suffice it to say that the record reveals abundant consideration of such criteria.

■■■■ Plaintiffs' second contention is awkwardly phrased. Implicit in the applicable standard is a requirement that impacts on the over-all area must be considered, but consideration of an over-all area is not an independent criterion. *See* ORS 215.515. We conclude that if the statutorily defined standard (the enumerated goals) is properly applied, a decision to amend a plan will normally be based on a sufficient consideration of the over-all area.[9] Plaintiffs have not drawn our attention to any relevant criterion not considered by the board.

## III. ADEQUACY OF THE FINDINGS

■■■■ Plaintiffs contend that the findings are inadequate. This contention raises the most difficult issues in this case. *Green v. Hayward,* 275 Or 693, 552 P2d 815 (1976), stressed the importance of the findings requirement and elaborated on what constitutes adequacy in the finding context. Adequate findings are much more than findings of fact; they are a "statement of reasons" for a given land-use decision. *Green,* 275 Or at 706. Not any statement of reasons will suffice. Once a decision-making body has applied the proper legal standards as indicated above, it must prepare findings which explain why its decision is in conformance with the relevant land-use goals. To prove conformance, findings should at least: (1) explain which criteria are considered relevant; (2) state the facts which were relied upon in rendering a decision;[10] and

---

[9] We realize that the plaintiffs' argument is based on paragraph 2 of the Plan's procedures for amendment, which requires consideration of "the over-all area." This provision does not appear to add anything to the applicable standard as we interpret it. In any event, the record shows that evidence was specifically offered regarding the impact the Town Center would have on a major portion of the Portland metropolitan area, including regions outside Clackamas County.

[10] It is appropriate to state relevant facts in the findings themselves, but facts may be stated by specific references to a part of the record containing facts relied upon.

(3) explain why the decision made is justified—that is, why a decision which advances some goals but not others is considered to be consistent with the applicable land-use scheme. This is not a mechanical test for adequacy; it is intended as guidance for governing bodies which are charged with the responsibility of proving that there is an acceptable reason for arriving at a given land-use decision. Since examination of the findings is the only effective means the courts have of ascertaining whether this responsibility is being discharged properly, we again state that, while preparing findings, " '* * *Brevity is not always a virtue.* * *' " Green v. Hayward, Supra, 275 Or at 707, quoting *Home Plate, Inc. v. OLCC,* 20 Or App 188, 530, P2d 862, 863 (1975).

Here, the board's findings state, in their entirety:

"The Board having fully considered said testimony as it relates to the promotion of the Public Health, Safety and General Welfare of the citizens of Clackamas County and the various characteristics of the general area in question together with the suitability of the subject area for particular land uses and improvements; the land uses and improvements in the subject area; trends of land developments; density of developments; property values; the needs of economic enterprises in the future development of this area; the natural resources of Clackamas County and prospective needs for development thereof; and the public need for healthful, safe, aesthetic surroundings and conditions; and

"Based upon the evidence and testimony presented to this Board, and not relying on the recommendation of the Planning Commission because of alleged procedural problems, this Board now finds as a matter of fact:

"1. The proposed amendment is appropriate at this time, being in agreement with the introductory letter in the Comprehensive Plan which states '. . . and while the plan is only a start, it is a good start. It gives the County some direction for its future growth, but the momentum must be sustained. The next step must be taken.'

"2. The proposed request complies with the goals and policies of the Comprehensive Plan in that:

"A. It provides the designated commercial lands

[ 657 ]

of sufficient size to serve the needs of North Clackamas County and the southeast Portland region;

"B. Provides incentives for orderly development of the area as designated in the Comprehensive Plan;

"C. Discourages the further expansion of highway commercial or strip commercial development in the area;

"D. Meets the criteria for the location of a commercial development that will best serve a vast area, that being Service District No. 1, the Tri-County Service District area and surrounding areas;

"E. The overall area which is made up of various parcels of land has been considered in this proposal.

"3. The applicant has demonstrated that undeveloped commercially zoned parcels of land of comparable size are not available in the area;

"4. The proposed amendment would be of a greater benefit to the public and the area affected than the existing designation because it provides for a larger and more diversified commercial center;

"5. State and County arterial roads and highways appear to be designed so the proposed commercial area traffic will be properly served, and are capable of handling any increased traffic loads;

"6. Public need has been established in that:

"A. The need for a conventional commercial development in this area has been documented;

"B. Economic aid derived from this plan amendment would be extremely beneficial to the existing taxing entities of the area, that being Clackamas County, Fire District #56, Service District #1, Clackamas Water District and others;

"C. Over 4,000 job opportunities will be provided at the proposed development. A substantial contribution would be made to the economy resulting from a $60,000,000 [sic];

"D. It will expedite the development of more additional mass transit for North Clackamas County;

"E. The location of the commercial development will assist in alleviating the energy crisis;

"F. Increasing the land now available for com-

mercial development will provide the opportunity for development that can contain more open space and a more aesthetically pleasing commercial area.

"7. The overall benefits to the community and surrounding area significantly outweighs any adverse impact on the surrounding area."

The first paragraph is apparently intended to demonstrate that the board honors the spirit of the hortative language contained in the first paragraph of ORS 215.515.[11] These introductory words by the board, as well as findings 1 and 7, neither contribute to nor detract from the findings on the specific statutory criteria.

Plaintiffs make three basic contentions regarding the board's remaining findings; first, that there was no consideration of whether there is a public need for a regional, as opposed to a conventional, shopping center; second, that even assuming, arguendo, the need for a regional center, the board did not find that the land in question is the best location for such a center; and third, that the board has not stated why it decided as it did.

The first two contentions are apparently based on the proposition that *Fasano's* two-part minimum standard is a separate standard which must be specifically addressed in addition to the statutory standard.

---

[11] "Comprehensive physical planning, adopted by this commission prior to the expiration of one year following the date of the approval of state-wide planning goals and guidelines under ORS 197.240 should provide guidance for physical development within the state responsive to economic development, human resources development, natural resource development and regional and metropolitan area development. It should assist in attainment of the optimum living environment for the state's citizenry and assure sound housing, employment opportunities, educational fulfillment and sound health facilities. State plans should relate to intermediate and long-range growth objectives. The plans should set a pattern upon which state agencies and local government may base their programs and local area plans * * *." ORS 215.515.

As indicated above, this is usually not the case, and is not so here.[12] The statutorily defined goals dictate the legal standard with which the board must comply.

Adverting to the goals listed in ORS 215.515, we conclude that the findings do address rather directly facts relating to goals (b), (e), (g), (h), (i) and (j). Goal (d) is arguably irrelevant. The remaining goals—(a), (c) and (f)—are indirectly addressed. Air and water quality (goal (a)) was considered in connection with assessing the impact the Town Center would have on service districts and highways. Recreational needs (goal (c)) were considered during assessment of the advantages of the "diversified commercial center" mentioned in finding 4. Last, consciousness of goal (f) seems to be implicitly reflected in finding 2(d). We therefore turn to the plaintiffs' third contention—has the board satisfactorily explained its decision.

Findings 2 through 6 implicitly state the board's reasons for its decision. As we read them, these reasons might be summarized as follows: some of the original goals for the area will be fostered because orderly development will be encouraged; the needs of the regional population will be well-served without overburdening the service districts in the area; the economy of the region will be benefited; mass transit will be encouraged; open space and energy will be preserved; taxing entities will be benefited; and roads will not be overtaxed—in other words, there is a public need for the Town Center and no other location for its construction as desirable.

These statements adequately explain why the board decided to produce a situation which would enhance some, if not all, of the statutory goals. For

_____
[12] In any event, the board made express findings regarding public need. It also found that there was a need for a conventional shopping center in the area (finding 6A), and that a regional shopping center would be even more desirable than a conventional center (finding 4). The board also found that the land in question was the only location which would serve the area in need (finding 3).

example, we are told that orderly development of an area already largely designated for commercial use will be facilitated if a diversified commercial center is constructed rather than strip commercial developments. There is also some discussion of negative consequences such as congestion on arterial roads, together with reasons for concluding that these consequences will be manageable. We hold that the findings taken as a whole are adequate, but only marginally so.

If *Green v. Hayward, supra,* had been handed down at the time the board made its order we might well have demanded more detailed references to facts relied on and more in the way of a statement of reasons for the decision.[13] However, we cannot ignore the fact that in this case the record itself reveals a comprehensive hearing and a great body of evidence, predominantly favoring the proposed amendment, which pertained to the relevant goals.

## IV. REMAINING PROCEDURAL ISSUES

Plaintiffs' procedural contentions, in addition to those relating to the adequacy of the findings, are: (1) that the board was without jurisdiction to consider the amendment because a defective vote by the planning commission rendered the required planning commission recommendation invalid; and (2) that certain features of judicial hearing procedures, such as cross-examination, were not followed.

### 1. The Board's Jurisdiction

Plaintiffs contend that the board cannot consider a comprehensive-plan amendment if the planning commission has not submitted a valid recommendation in favor of amendment. Plaintiffs further contend that the planning commission vote was invalid because the

---

[13]This flexibility is consistent with *Green v. Hayward,* 275 Or 693, 552 P2d 815 (1976). *Green* involved a land-use decision which occurred at a time when local governments were not certain of the procedures *Fasano* required, and the *Green* court took that fact into consideration. 275 Or at 705.

fifth vote needed to recommend approval was cast by a commissioner who arrived late at the final hearing. It does appear from the record that the commissioner did vote without the benefit of either hearing or in some other way familiarizing himself with much of the testimony offered at a planning commission hearing. While this may invalidate his vote on due process grounds, we do not consider that issue here because we conclude that the board's jurisdiction to amend the comprehensive plan is not conditioned upon a recommendation of approval from the planning commission.

■ Although county governing bodies are authorized to create planning commissions, they are not required to do so. ORS 215.020. Each county governing body is required to retain responsibility for land-use planning within its county. ORS 197.190(1). In other words, the board is the governing body vested with authority to make county land-use decisions. *Link v. City of Coos Bay,* 23 Or App 648, 543 P2d 1082 (1975). As such, the board is not bound by the commission's recommendations. It can, for instance, approve a land use even if the commission disapproves. Once this is understood, the fallacy in plaintiffs' argument emerges. If the board were powerless to act without a recommendation of approval from the commission, it could never override a commission decision to directly disapprove, or indirectly disapprove through inaction, a given land-use request.

### 2. Noncompliance with Judicial Hearing Procedures

Plaintiffs complain that they were not afforded "the procedural protections of a judicial-style hearing." Specifically, they contend that: (1) persons testifying before the board should have been put under oath, (2) cross-examination of persons testifying should have been allowed, and (3) a transcript of the planning commission hearings should have been prepared for review by the board.

■ *Fasano* does not support plaintiffs' demand for the application of relatively formal judicial procedures. *Fasano* does require that certain procedural safeguards accompany judicial land-use decisions. 264 Or, supra at 588. Rather than being required by statute, these procedures are evidently required by the due process provisions of the state and federal constitutions. *See West v. City of Astoria,* 18 Or App 212, 228-29, 524 P2d 1216 (1974) (Schwab, C. J., concurring); 36 Op Att'y Gen 960, 980 (1974). Accordingly, we judge the board's hearing procedures in light of a due process standard rather than on the basis of a mechanical rule that, for instance, there is always a right to cross-examination.

■ In *Green v. City of Eugene,* 22 Or App 231, 233, 538 P2d 368 (1975), we recognized that due process does not require us to

"* * * convert the relatively informal meetings of city councils and county commissioners into something more akin to formal court room proceedings * * *."

We thus hold that due process does not require witnesses before the board to be put under oath. *Accord,* 3 R. Anderson, American Law of Zoning § 16.30 at 222 (1968).

■ The right to cross-examination is a closer question, but we hold that the board's procedure did comport with due process. We note that "[c]ross-examination in the formal court sense of the term is uncommon in board hearings." 3 R. Anderson, supra, § 16.33 at 226. However, *Fasano* does give parties at a hearing the right to "present and rebut evidence." 264 Or at 588. This language must mean that two rights exist: the right to present one's own evidence and a separate right to rebut adverse evidence.

In this case plaintiffs were apparently allowed to submit to the board written rebuttal- or cross-examination-type questions if they so desired. Evidently, the questions could be responded to or ignored as the board members pleased. However, at the least

the plaintiffs were given an opportunity to draw the board's attention to their objections. They were also given ample opportunity to present their own evidence, and time was specifically set aside for rebuttal. Although arguably some courts would condemn the procedures used in this case, *see* Annotation, 27 ALR3d 1304 (1969), other courts have approved confrontation procedures in land-use cases analogous to those used by the board. *See* 3 R. Anderson, supra, § 16.33 at 227, n 5 (Cum Supp 1975), citing, e.g., *Hutson v. County of Cook,* 17 Ill App3d 195, 308 NE2d 65 (1974). We hold that, on balance, the procedure used in this case satisfied the minimum requirements of procedural due process.

■ The point regarding the lack of a transcript of the planning commission's proceedings is not well taken. Since the board conducted an evidentiary hearing of its own and produced a verbatim transcript of it for judicial consideration, due process is not violated by the fact that no transcript was prepared at the planning commission level. *See* 3 R. Anderson, *supra,* § 16.27.

Affirmed.