Argued May 3, 1977, reversed and remanded February 7, reconsideration denied March 15, 

## 1000 FRIENDS OF OREGON, THE ASSUMED NAME OF OREGON LAND USE PROJECT, INC. et al, *Appellants,*
### *v.*
## BOARD OF COUNTY COMMISSIONERS, BENTON COUNTY et al, *Respondents.*
### (No. 30380, CA 6885)

## 1000 FRIENDS OF OREGON, THE ASSUMED NAME OF OREGON LAND USE PROJECT, INC. et al, *Appellants,*
### *v.*
## BOARD OF COUNTY COMMISSIONERS, BENTON COUNTY et al, *Respondents.*
### (No. 30520, CA 6939)
### (Cases consolidated)

575 P2d 651

Robert E. Stacey, Jr., Portland, argued the cause and filed the briefs for appellants.

Todd G. Brown, Corvallis, argued the cause and filed the brief for respondents.

Before Schwab, Chief Judge, and Tanzer and Johnson, Judges.

JOHNSON, J.

## JOHNSON, J.

This is an appeal from the trial court's dismissal of writs of review of decisions by the Benton County Board of Commissioners approving two tentative subdivision plans concerning property in the Kings Valley area of Benton County. The "Moore" subdivision consists of 707 acres which are to be divided into 16 parcels, 12 of which would be 20 to 22 acres each. The "Stovall" subdivision consists of 180 acres which are to be divided into parcels ranging in size from 20 to 31 acres.

The following excerpts from the Board's findings provide a focus for the issues raised by petitioners.

"FINDINGS OF FACT:

"Kings Valley is a relatively narrow system following the meandering course of the Luckiamute River and various tributaries in northwestern Benton County. The gently rolling valley floor is approximately 12 miles long and varies in width from two miles to about 1000 feet. Its general shape resembles the letter 'Y'. Surrounding the valley are mountains of the coast range varying in elevation from 500 to 1600 feet above sea level.

"Soils in the area are residual on the hills with alluvial deposits in the valley floor. General agricultural suitability classes include mostly Classes III, IV and above with some small amounts of Class II. * * *
"* * * * *

"Land use in the area is predominantly timber and agricultural. Certain land is vacant and not actively farmed, grazed or in timber production. * * *

"The predominant agriculture is grazing, either sheep or cattle, and forestry, either Christmas trees or for lumber. The area is not highly productive and very few farms are economically self-sufficient.

"The Kings Valley study area contains 24,320 acres. * * * [T]here are approximately 52 parcels 0-4.9 acres, 44 parcels 5-19.9 acres, 17 parcels 20-39.9 acres, and 167 parcels 40 acres or more.
"* * * * *

[ 415 ]

"Petitioner proposes to subdivide approximately 180 acres into 9 lots ranging in size from 20.01 acres to 31.24 acres. The Petitioner's property has been relatively inactive, particularly in recent times, as a farming unit and although there was testimony to the contrary, Petitioner's testimony indicates that it is not possible to farm the property economically. Little, if any, active farming or ranching takes place on or near the property, but the proposal emphasizes open space so that individual owners of lots can have small plot gardening and farming operations and can graze a few livestock or animals.

"* * * * *

"The design and lot sizes are intended to preserve the rural and agricultural character of the area. All lots are designed for single family use. Lots are large enough to permit small farming and gardening or grazing of a few animals or livestock.

"* * * * *

[The omitted findings concern sewage disposal, vegetation, potable water, transportation facilities, schools, fire and police protection and utilities.]

"APPLICABLE LAW AND REGULATIONS:

"The rules to be applied to this application are to be found in the Benton County Subdivision Ordinance, Benton County Zoning Ordinance, Benton County Comprehensive Plan, the interim goals established by ORS Chapter 215 and the rules and regulations adopted by the Land Conservation and Development Commission.

"CONCLUSIONS:

"(1) The proposal is consistent with the interim goals contained in ORS Chapter 215 and with the goals and guidelines adopted by the Land Conservation and Development Commission in that the proposal provides for development of the properties commensurate with the character and physical limitations of the land, considering its marginal productivity, while conserving open space and protecting the nature and scenic resources of the area.

"(2) The proposal is consistent with the Benton County Comprehensive Plan. The subject property has been shown to be marginally productive farmland. It has been

[ 416 ]

further shown that due to the nature of the design together with its emphasis on agriculture, natural vegetation and topographical features in the area, such division will not interfere with the farming or forestry activities of the surrounding area. Considering the productivity of the land, the maximum density of the development is within the requirements of the Comprehensive Plan.

"(3) The proposal is in compliance with the Benton County Zoning Ordinance. Section 4.03 permits one single family dwelling per lot on the subject property and Section 4.05 sets a minimum lot size of 20 acres. The proposal bears lots ranging in size from 20.01 acres to 31.24 acres.

"(4) The proposal complies with the Benton County Subdivision Ordinance. All technical data required under such ordinance has been supplied by the Petitioner.

"(5) A public need exists in Benton County for small farmsteads not requiring full scale farm operation but permitting small scale agricultural activity. This proposal serves this need by providing smaller scale agricultural uses within easy reach of Corvallis, the principal metropolitan and marketing area of the County."

■ Petitioners' principal assignments of error are that the approvals of the subdivisions violate the county's comprehensive plan and the "Agricultural Lands" Goal, (Goal 3), of the State-Wide Planning Goals and Guidelines of the Land Conservation and Development Commission, (LCDC), Oregon Administrative Rules, ch 660, § 10-060. Petitioners set forth two other related assignments of error which we will resolve at the outset. First, they contend there was not substantial evidence to support the county's findings that the land to be subdivided is "marginally productive farmland" and that the proposed subdivisions will not "interfere with the farming or forestry activities of the surrounding area." A review of the record indicates there was substantial evidence to support these findings.

■ Second, petitioners contend that the trial court erred in refusing to consider the statewide planning

goals and guidelines adopted by LCDC effective January 1, 1975 (LCDC goals), and holding instead that only the interim goals of ORS 215.055 were applicable. This issue was resolved in *Sunnyside Neighborhood v. Clackamas Co. Comm.,* 280 Or 3, 569 P2d 1063 (1977) wherein the Supreme Court held that in a quasi-judicial plan changing proceeding, the 1975 statewide planning goals adopted by LCDC superceded the interim goals of ORS 215.055. It follows that the same goals apply to a subdivision approved after January 1, 1975, and that the trial court erred. This error, however, is not grounds for reversal if the county's decision conforms as a matter of law with the LCDC goals.

### COMPLIANCE WITH THE COUNTY'S COMPREHENSIVE PLAN

■ The Benton County Comprehensive Plan map designates Kings Valley as "agriculture, forestry and/or flood plain" which are described in the legend of the plan as follows:

> "Primary agricultural and forestry lands to remain in agricultural and forestry use, with other compatible uses permitted or subject to Commission approval *as outlined in the applicable provisions of the Zoning Ordinance.* Residential development shall be permitted only as needed in conjunction with farm or forestry management or when approved as a conditional use by the Commission when it has been reasonably demonstrated that the land to be developed is marginally productive resource land and that such development will not interfere with the farming or forestry activities of the surrounding area. The maximum density for residential development shall be inversely related to the resource productivity of the land, ranging from one dwelling unit per 40 acres to one dwelling unit per acre as designated on the official Zoning Map or *through the corresponding provisions of the Zoning Ordinance.*" (Emphasis supplied.)

Petitioners contend that the subdivision approval was not in conformance with the plan because the county did not follow a conditional use procedure or

[ 418 ]

otherwise comply with the quoted standards. The property is zoned as an "Agricultural/Forestry" district under Article IV of the Benton County Zoning Ordinance, which in pertinent part provides:

"Section 4.01 Purposes

"To preserve and protect lands for continued agricultural and forestry production and to provide for the orderly development through planned development of both public and private recreational areas. Uses of land not associated with agricultural or forestry production shall be discouraged to minimize potential hazard of damage from fire, erosion, pollution, or conflicting land uses.

"Section 4.02 Standards for Application

"The Agricultural and Forestry District is intended for application to rural areas having natural resource value directly beneficial to agricultural and/or forestry activities.

"Section 4.03 Permitted Uses

"1. Management, production, and harvesting of agricultural and/or forestry products.

"2. One single-family dwelling or mobile home per lot.

"* * * * *

"4. Home occupation as defined in Section 1.03.

"Section 4.04 Conditional Uses (as defined in Section 20.05, 1 and 2)

"* * * * *

"7. Lot areas of less than twenty (20) acres.

"* * * * *

"Section 4.05 Lot Area Requirement

"The minimum area of any lot located in the Agricultural and Forestry District shall be twenty (20) acres."

The purpose of the Agricultural/Forestry District as stated in Section 4.02 above is made clear when read in conjunction with the entire Benton County Zoning Ordinance which establishes 14 different types of zoning districts. In particular, Article 3 of the Benton County Zoning Ordinance provides for forestry conservation districts with minimum lot sizes of 40 acres, the

purpose of which is "to preserve and protect lands for continued forest *management,* production, *harvesting* and related uses." Section 3.01. (Emphasis supplied.) Article 5 of the ordinance provides for exclusive farm use zones under ORS 215.203 with minimum lot sizes of 40 acres, the purpose of which is "to preserve and protect for continued agricultural *management,* production, *harvesting* and related uses." Section 5.01. (Emphasis supplied.) It is apparent that the purpose of Articles 3 and 5 is to preserve agricultural and forestry lands because of their economic productivity. In contrast, Article 4 provides for a minimum lot size of 20 acres. The statement of purpose as set forth in Section 4.01, quoted above, refers to both agriculture and forestry, deletes the words "management" and "harvesting" as they appear in Articles 3 and 5, and contains the additional clause: "and to provide for the orderly development through planned development of both public and private recreational areas." This difference in wording in Article 4 is substantive. Unlike the forestry conservation and exclusive farm use districts, the purpose of Agricultural/Forestry districts is not primarily economic, but is to protect a rural status to provide for orderly development of recreational areas.[1]

Petitioners maintain that the proposed subdivisions' compliance with the county's zoning ordinance is not adequate to be in conformity with the plan. In

_____

[1]The classification method used by Benton County in establishing forest conservation, exclusive farm use and agricultural/forestry districts is similar to that employed by LCDC. Goal 3 defines and establishes planning objectives for agricultural lands. Goal 4 makes similar provisions for forest lands. These goals are intended to preserve agricultural and forest lands for commercial purposes. A third category of lands under the LCDC goals comparable to the agricultural/forestry district are rural lands which are defined in the goals as follows:

"RURAL LAND: Rural lands are those which are outside the urban growth boundary and are:

"(a) Non-urban agricultural, forest or open space lands or,

"(b) Other lands suitable for sparse settlement, small farms or acreage homesites with no or hardly any public services, and which are not suitable, necessary or intended for urban use."

[ 420 ]

*Baker v. City of Milwaukie,* 271 Or 500, 533 P2d 772 (1975), it was held that where there was a conflict between a comprehensive plan and a zoning ordinance, the plan prevails. In *Baker* the plan was adopted two years after the ordinance. The city had made no effort to conform the ordinance to the plan and it was admitted on demurrer that they were in conflict. Here, the plan and zoning ordinance were enacted contemporaneously in 1974. They are in fact compatible with each other. The zoning ordinance was adopted with the express purpose of "carry[ing] out the Comprehensive Plan of the county." Article I § 1.02(10) of the Benton County Zoning Ordinance. The quoted portion of the plan expressly provides that "the maximum density for residential development shall be * * * as designated * * * through the corresponding provision * * * of the Zoning Ordinances." The county's findings contemplate a more intensive residential use than heretofore existed on the lands at issue, but also contemplate continued retention of the land in a rural status. The proposed subdivision is not a conditional use under the zoning ordinance, and thus under the plan, because the lot sizes are 20 acres or more. The county also made findings that the land is "marginally productive resource land" and that the subdivision "will not interfere with farming or forestry activities of the surrounding area." The county's decision is consistent with the comprehensive plan.

## COMPLIANCE WITH LCDC GOALS

### 1. Nature of LCDC Goals

■ There is a recognized hierarchical relationship between the comprehensive plan, zoning laws and subdivision ordinances. At the bottom of the hierarchy is the decision to approve or disapprove a tentative subdivision plan. In approving a subdivision, the decision-making body must first ascertain whether it is in compliance with the zoning ordinance. *Bienz v. City of Dayton,* 29 Or App 761, 566 P2d 904, *rev den* (1977). Next it must determine that the zoning ordinance is in compliance with the comprehensive plan.

[ 421 ]

*Baker v. City of Milwaukie, supra.* The plan has been likened to a constitution implemented by zoning and subdivision ordinances. *Baker v. City of Milwaukie, supra,* 271 Or at 507.

■ It is implicit in the statutory scheme of Senate Bill 100 that LCDC goals are in effect the "constitution" for local government comprehensive plans. The difficulty with this concept is that the LCDC goals are like a constitution with a preamble but a dearth of operative articles. The Oregon Supreme Court noted in *Sunnyside Neighborhood v. Clackamas Co. Comm., supra,* 280 Or at 15, that "* * * the LCDC goals * * * are devoted primarily to the overall planning process. With some few exceptions, they are not designed to guide decisions about permissible uses of particular pieces of property * * *." The LCDC goals, read in their entirety, are essentially a list of planning objectives. Portions of the following language from our opinion in *Sunnyside Neighborhood v. Clackamas Co. Comm.,* 27 Or App 647, 557 P2d 1375 (1976), were quoted with approval by the Supreme Court on review, 280 Or at 12, and the quote is equally applicable here with respect to the LCDC goals:

> "Comprehensive plan amendments [and other land use decisions] need not serve the ends of each and every applicable planning goal. Indeed, *Green* implicitly acknowledges that it is normally impossible to subserve all goals because any list of planning goals will contain a variety of sometimes-inconsistent land-use objectives. *See* 275 Or at 704. [*Green v. Hayward,* 275 Or 693, 552 P2d 815 (1976)]. Compliance is achieved if local governments can adequately demonstrate that an amendment results in a plan which considers and accommodates as much as possible all applicable planning goals. *Cf.* ORS 197.015(4)." 27 Or App at 654.

2. Application of LCDC Goals:

Petitioners contend that the subject subdivisions do not comply with LCDC Goal 3 relating to agricultural lands, which in pertinent part provides:

> "To preserve and maintain agricultural lands.

"Agricultural lands shall be preserved and maintained for farm use, consistent with existing and future needs for agriculture products, forest and open space. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS ch 215. Such minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise within the area.

"* * * * *

"AGRICULTURAL LAND—in western Oregon is land of predominantly Class I, II, III and IV soils and in eastern Oregon is land of predominantly Class I, II, III, IV, V and VI soils as identified in the Soil Capability Classification System of the United States Soil Conservation Service, and other lands which are suitable for farm use taking into consideration soil fertility, suitability for grazing, climatic conditions, existing and future availability of water for farm irrigation purposes, existing land use patterns, technological and energy inputs required, or accepted farming practices. Lands in other classes which are necessary to permit farm practices to be undertaken on adjacent or nearby lands, shall be included as agricultural land in any event.

"* * * * *

"FARM USE—is as set forth in ORS 215.203 and includes the non-farm uses authorized by ORS 215.213."

The county's findings state that soils of the lands in Kings Valley are "mostly Classes III, IV *and above* with some small amounts of Class II." (Emphasis supplied.) Petitioners' position in effect is that, by virtue of the soil classification, the lands cannot be subdivided for the rural residential purposes and attendant farming as contemplated by the board's findings. Petitioners ignore the fact that, according to the county's findings, at least some of the land is "above" Class IV and thus would not come within the soil classifications mentioned in Goal 3. However, we are unable to ascertain from the findings what the county found to be the soil composition of the property

[ 423 ]

to be subdivided. The county's findings refer to the soil composition of the Kings Valley area as a whole, and not specifically to the proposed subdivision property.

■ In any event, assuming that the subdivision property comes within Classes I through IV, this fact does not necessarily support the position advanced by petitioner. Goal 3 must be read in context with the definition of "farm use" in ORS 215.203 which provides:

"(1) Zoning ordinances may be adopted under ORS 215.010 to 215.190 and 215.402 to 215.422 to zone designated areas of land within the county as farm use zones. Land within such zones shall be used exclusively for farm use except as otherwise provided in ORS 215.213. Farm use zones shall be established only when such zoning is consistent with the overall plan of development of the county.

"(2)(a) As used in this section, 'farm use' means the *current employment of land* including that portion of such lands under buildings supporting accepted farming practices *for the purpose of obtaining a profit in money* by raising, harvesting and selling crops or by the feeding, breeding, management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honeybees or for dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof. 'Farm use' includes the preparation and storage of the products raised on such land for man's use and animal use and disposal by marketing or otherwise. It does not include the use of land subject to the provisions of ORS chapter 321, or the construction and use of dwellings customarily provided in conjunction with the farm use.

"(b) 'Current employment' of land for farm use includes (a) land subject to the soil-bank provisions of the Federal Agricultural Act of 1956, as amended (P. L. 84-540, 70 Stat. 188); (B) land lying fallow for one year as a normal and regular requirement of good agricultural husbandry; (C) land planted in orchards or other perennials prior to maturity; and (D) any land constituting a woodlot of less than 20 acres contiguous to and owned by the owner of land specially assessed at true

cash value for farm use even if the land constituting the woodlot is not utilized in conjunction with farm use.

"(c) As used in this subsection, 'accepted farming practice' means a mode of operation that is common to farms of a similar nature, necessary for the operation of such farms *to obtain a profit in money,* and customarily utilized in conjunction with farm use." (Emphasis supplied.)

The relevant statutory words are "current employment of land" for agricultural production "for the purpose of obtaining a profit in money." ORS 215.203 to 215.273 create a unique statutory form of zoning applicable to farm land. These statutes were enacted together with ORS 308.345 to 308.403 as a legislative program to provide property tax relief for certain farm lands. *Rutherford v. Armstrong,* 31 Or App 1319, 572 P2d 1331 (1977). Because they are taxation statutes the primary emphasis is on the "current employment of the land" so that status may be determined for taxation purposes. In contrast most zoning laws, and Goal 3, are primarily concerned with both existing and future land uses. Petitioners argue that if lands are within the soil classification of Goal 3, such lands under the operative provisions of that goal must automatically be zoned for exclusive farm use. The argument goes too far and would defeat the apparent purpose of the goal. LCDC cannot compel exclusive farm use zoning under ORS 215.203 if the lands are not "currently employed" in profitable agricultural production and thus do not meet the statutory qualifications for such zoning. To adopt petitioners' position would result in Goal 3 only applying to lands currently in that status. Landowners could avoid the application of Goal 3 by simply taking their land out of production.

The Goal 3 definition of agricultural lands is not limited to lands that presently qualify under ORS 215.203. The phrase "which are suitable for farm use" applies to all the lands described in the agricultural land definition. "Suitable" means appropriate for. Webster's Third New International Dictionary (1971).

The first sentence of the operative provisions of Goal 3 states that "agricultural lands shall be preserved and maintained *for* farm use * * *." (Emphasis supplied.) We construe this sentence independently from but as a corollary to the second sentence. Reading the two sentences together, they provide that lands "suitable for farm use" zoning shall be preserved and maintained in that status until such time as they have been inventoried and placed in exclusive farm use zones under ORS 215.203.[2] Goal 3, therefore, must be addressed if any of the lands are capable, now or in the future, of being "currently employed" for agricultural production "for the purpose of obtaining a profit in money."[3]

■ However, contrary to petitioners' position, Goal 3 does not mandate that all agricultural lands be preserved and maintained for farm use and eventually placed in exclusive farm use zones. The goal requires that such action be taken "consistent with existing needs for agricultural production, forestry and open

[2] The status can be preserved and maintained by exercise of the county's general zoning powers under ORS 215.010 to 215.190. Under these statutes, counties could, for example, establish exclusive agricultural use districts just as they can prescribe use for any land within a county's jurisdiction. Thus, the same land use objectives can be attained under the county's general powers as can be accomplished under ORS 215.203 to 215.273. The only limitations on counties, and LCDC, is that they cannot place lands in an "exclusive farm use zone" under ORS 215.203 and attain the resulting tax benefits for landowners unless the lands are "currently employed" in agricultural production for the purpose "of obtaining a profit in money."

[3] As pointed out at pages 6 and 7 above, the county apparently made a legislative judgment in 1974 when it adopted its comprehensive plan and the zoning ordinance that the subject lands were not suitable for exclusive farm use zoning. The county does not argue that compliance with Goal 3 cannot be reviewed in this writ of review proceeding because that prior legislative judgment is not a quasi-judicial decision subject to writ of review. In any event, the argument must fail because that legislative judgment was made prior to the effective date of the LCDC goals which was January 1, 1975. In *Sunnyside Neighborhood v. Clackamas Co. Comm.*, 280 Or 3, 569 P2d 1063 (1977), the court held that county's compliance with LCDC goals can be judicially reviewed in a writ of review proceeding. A different result might occur if the county had made a comprehensive review of its plan and ordinances to determine compliance with LCDC goals and had received from LCDC a compliance acknowledgement in accordance with ORS 197.251.

[ 426 ]

space." This is in harmony with the principle we established in *Sunnyside Neighborhood* that local governments are required to address and accommodate "as much as possible all applicable planning goals." 27 Or App at 654. The quoted language from Goal 3 is an express directive by LCDC that Goal 3 must be considered in conjunction with other LCDC goals, specifically Goal 4, Forest Land, and Goal 5, Open Space. It is also clear that considering Goals 3, 4 and 5 alone may not be sufficient when those goals are read in context with all LCDC goals. For example, Goal 14, Urbanization, has specific provisions applicable to lands which meet the agricultural lands definition of Goal 3.

3. The County's Findings:

There is no indication in the county's findings that Goal 3 or any of the other LCDC goals, with the possible exception of Goal 5, have even been addressed. The county in effect merely states a conclusion that the proposed subdivision is consistent with the LCDC goals. The only findings that appear to have relevance to Goal 3 are that the subject property "has been relatively inactive * * * as a farming unit", that there is "marginally productive farmland" and that the proposed subdivisions are "commensurate with the character and physical limitations of the land, considering its marginal productivity, while conserving open space and protecting the nature and scenic resources of the area." A possible deduction to be drawn from these findings is that the lands do not come within the purview of Goal 3 because they are not in "farm use," i.e. the lands are not "currently employed" in agricultural production "for the purpose of obtaining a profit in money." For reasons stated, the current status of the property does not render Goal 3 inapplicable. The finding that the subject lands are "marginally productive" does not sufficiently address the Goal 3 criteria. Goal 3 is concerned with the preservation of agricultural lands not only because of their present, but also

their future commercial productivity. The incorporation in Goal 3 of the statutory prerequisite of ORS 215.203 that the lands be capable of "obtaining a profit in money" does not change the meaning of the basic Goal 3 planning objective. Indeed it is clear that marginally productive land can qualify for exclusive farm use zoning under ORS 215.203.

■ We held in *Rutherford v. Armstrong, supra,* that even though a five-acre parcel "could not support an economically profitable farm unit," it nevertheless could be sufficiently profitable to qualify for "farm use" under ORS 215.203. In that case we traced the legislative history of ORS 215.203, pointing out that from 1967 to 1973 the statute required only that "the whole parcel" produce a "gross income from farm uses of $500 per year" to satisfy the requirements of "obtaining a profit in money." The $500 test was deleted from the statute in 1973. In 1977 the legislature enacted ORS 308.372, Oregon Laws 1977, ch 339,[4]

[4]ORS 308.372 provides in part:

"(1) For purposes of ORS 215.203, 215.213 and 308.345 to 308.403, farmland that is not within an area zoned for farm use under ORS 215.010 to 215.190 and 215.402 to 215.422, is not used exclusively for farm use unless in three out of the five calendar years immediately preceding the assessment date the farmland was operated as a part of a farm unit that has produced a gross income from farm uses in the amount provided in subsection (2) of this section. As used in this section, 'gross income' includes the value of any crop or livestock that is used by the owner personally or in his farming operation, but shall not include the value of any crop or livestock so used unless records accurately reflecting both value and use of the crop or livestock are kept by the owner in a manner consistent with generally accepted accounting principles. The burden of proving the gross income of the farm unit for the years described in this subsection is upon the person claiming special assessment for the land.

"(2) (a) If the farm unit consists of less than five acres, the gross income amount required by subsection (1) of this section shall be at least $500.

"(b) If the farm unit consists of five acres but does not consist of more than 20 acres, the gross income amount required by subsection (1) of this section shall be at least equal to the product of $100 times the number of acres and any fraction of an acre of land included.

"(c) If the farm unit consists of more than 20 acres, the gross income amount required by subsection (1) of this section shall be at least $2,000.

"* * * * *"

which reinstated a gross income test based upon acreage in a parcel. But that test applies only to unzoned "farm use" land, i.e. unzoned farm land which is entitled to the "farm deferral" tax under ORS 308.370(2).[5] ORS 308.380 also provides that the Department of Revenue shall "provide by regulation for a more detailed definition of farm use * * * for determining eligibility of unzoned farm land under ORS 308.307(2)." The statutes have remained silent since 1973 with respect to specific standards for determining what is meant by "obtaining a profit in money" for land placed in exclusive farm use zones under ORS 215.203.

The legislative history of ORS 215.203 indicates that the use of the term "profit" in that statute does not mean profit in the ordinary sense, but rather refers to gross income inasmuch as this was the test under the former $500 standard and is the present statutory standard for unzoned farm land. Since the legislature did not specify a gross dollar amount required for lands to qualify for exclusive farm use zones under ORS 215.213, it intended that this be a matter of discretion for the counties. LCDC may as part of its goals impose limits on that discretion. Thus, if the lands meet the definition of "agricultural lands" as provided in Goal 3, and are capable of current employment for agricultural production for the purpose of earning money receipts, Goal 3 is applicable and the county is required to address the considerations set forth in the operative provisions of that goal.

We are unable to determine from the county's findings whether the proposed subdivision lands are

---

[5] ORS 308.370 provides for two types of property tax treatment for farm lands. If lands are contained within an exclusive farm use zone under ORS 215.203, then they are taxed at "the true cash value for farm use." ORS 308.370(1). Owners of non-zoned farmland may apply for farm tax deferral. If the land is "farm-use" land as defined in ORS 215.203, as modified and further defined by ORS 308.372 and 308.380, then the land is taxed as "the true cash value for farm use." However, if the owner of non-zoned farm land changes the use to a non-farm use, then under ORS 308.395 he is liable for a substantial additional assessment.

within the soil classifications mentioned in Goal 3 or are otherwise "suitable for farm use." There is no indication in the county's findings that Goal 3 has been addressed and accommodated with other LCDC goals.[6]

Reversed and remanded.

**SCHWAB, C. J.,** concurring.

I agree with the result. The county's findings should "precisely state what it found to be the facts and * * * explain why those facts lead it to the decision it makes." *Home Plate, Inc. v. OLCC,* 20 Or App 188, 190, 530 P2d 862 (1975); *see also, McCann v. OLCC,* 27 Or App 487, 556 P2d 973 (1976), *rev den* (1977). They do not.[1]

Since we are remanding because of insufficient findings, I do not think it is necessary to discuss all issues raised. I do not join the parts of the majority opinion that deal with issues other than whether the

---

[6] Alternatively, the County's findings of "marginal productivity" might be construed as applicable to ORS 215.213 which permits certain non-farm uses within an exclusive farm-use zone established under ORS 215.203. In particular, ORS 215.213(3) permits single family residences on land "generally unsuitable for the production of farm crops and livestock." However, we do not construe this statutory exception as indicating any substantially different criteria for determining whether lands are "suitable for farm use" under Goal 3. Furthermore, in order for a county to invoke ORS 215.213(3) it must make specific findings under that statute which it has failed to do here.

[1] The normal first step in applying Goal 3 would be a specific finding on soil types. LCDC has ruled that a given piece of property either is or is not predominantly Class I through IV soils. *Lord and Skrepetos v. Jackson County,* LCDC Opinion and Order No. 77-001.

I agree with the majority that the county's March, 1976 amended finding that "[g]eneral agricultural suitability classes include mostly Classes III, IV and above with some small amounts of Class II" is a reference to the Kings Valley area, not a finding about the soil quality of the subject property. This becomes clear from examination of the county's original July and September, 1975 findings that the subdivisions would be on land with "soils of predominantly Class II, III and IV agricultural capacity."

findings are adequate to demonstrate compliance with LCDC Goal 3.[2]

Some analysis of LCDC Goal 3 may be warranted as guidance on remand. However, I fear the majority's discussion of the LCDC goals, particularly Goal 3, may be capable of misinterpretation. I join that part of the majority opinion based on my understanding that it holds:

1. LCDC goals apply to these subdivision approvals issued during 1975. Although *Sunnyside Neighborhood v. Clackamas Co. Comm.,* 280 Or 3, 569 P2d 1063 (1977), only held LCDC goals applied to a comprehensive plan amendment during 1975, the rationale of *Sunnyside* combined with the rationale of *Bienz v. City of Dayton,* 29 Or App 761, 566 P2d 904, *rev den* (1977), makes the goals equally applicable to subdivision approvals during 1975.[3]

2. Goal 3, standing alone, requires that all agricultural land be planned and zoned exclusively for farm

<hr/>

[2] If I felt it necessary to reach the issue, I would disagree with the majority's conclusion that there is substantial evidence to support the findings that the land to be subdivided is "marginally productive farmland" and that the proposed subdivisions will not "interfere with the farming and forestry activities in the surrounding area." On the productivity issue, the only evidence I find is that the prior and current owners, who for all I know from the record made no serious effort to produce from the land, have been relatively unsuccessful. But as I thought the majority at least implied in referring to landowners "simply taking their land out of production," 32 Or App at 425, one owner's lack of success should not be regarded as substantial evidence about what could be produced by a reasonably motivated and skilled farmer. On the interference issue, I find no evidence in the record.

[3] Since 1973, ORS 197.300(1)(b) has at least implied that "a land conservation and development action" is subject to LCDC goals. I interpret the quoted phrase as including subdivision approval. Recent amendments are even more explicit. ORS 197.252, adopted in 1977, authorizes LCDC "to direct the city or county to apply specified goal requirements in approving or denying future land conservation and development actions * * *." ORS 197.275(2), adopted in 1977, provides that after LCDC has acknowledged that a county's comprehensive plan is in compliance with LCDC's goals, "the goals shall apply to land conservation and development actions and annexations only through the acknowledged comprehensive plan * * *." The implication is that unless there is an acknowledged comprehensive plan, the goals apply to land conservation and development actions, i.e., subdivision approvals, independently.

use. However, interpreted in context with the other goals, there are exceptions that permit planning and zoning agricultural land for nonfarm use.

3. Agricultural land, as defined by Goal 3, means: (a) in western Oregon, land with predominantly Class I through IV soil; (b) other land which is suitable for farm use; and (c) other land on which use needs to be restricted to protect farm use on adjacent or nearby land.

4. While Goal 3 generally mandates exclusive farm use zoning for all agricultural land so defined, nothing in Goal 3 or ORS ch 215 prohibits a county from zoning other land EFU, even though it is not agricultural land within the meaning of Goal 3.

5. The cross-reference in Goal 3 to the definition of farm use in ORS 215.203 is a reference to what *use,* present or future, that agricultural land should be "preserved and maintained for"; it is not part of the definition of what *land* will be "preserved and maintained."

6. The reference in ORS 215.203(2)(a) to the "current employment" of land is irrelevant in applying Goal 3 because it is a tax rule, not a land use rule.

7. The reference in ORS 215.203 to the profitability of agricultural land probably means that it is not mandatory that agricultural land within the meaning of Goal 3 be zoned for farm use if a county determines that the land cannot presently or in the foreseeable future be farmed profitably by any reasonable and prudent farmer (*see* n 2, supra) and that determination is supported by substantial evidence. But the evidentiary burden in such a situation would likely be substantial, because Goal 3 would seem to at least create a presumption that Class I through IV soil can be profitably farmed. However, I do not understand the majority to be ruling one way or the other on this profitability issue, nor do I.