Argued July 25, affirmed in part, reversed in part November 6, 1978,
petition for review denied May 1, 1979

MEYER et al, *Petitioners,*
*v.*
LORD et al, *Respondents.*
(LCDC No. 77-001, CA 10346)

586 P2d 367

Ronald K. Cue, Ashland, argued the cause and filed the brief for petitioners.

Robert E. Stacey, Jr., Portland, argued the cause and filed the brief for respondents Lord and Skrepetos.

Frank W. Ostrander, Assistant Attorney General, Salem, argued the cause for respondent Land Conservation and Development Commission. With him on the brief were James A. Redden, Attorney General, Salem, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Lee, Richardson and Joseph, Judges.

JOSEPH, J.

## JOSEPH, J.

Intervenors seek judicial review of an order of the Land Conservation and Development Commission (LCDC) which vacated a zone change by Jackson County and remanded the matter to the Board of County Commissioners (Board) for reconsideration consistent with the LCDC opinion. The petition for review before LCDC challenged a zone change for a 70-acre parcel in a 250-acre farm owned by intervenors. The prior zoning was Exclusive Farm Use (EFU), which permitted outright the building or residential structures only in conjunction with farm use. The new zoning would be Farm Residential (F-5), which permitted the building of a single family residence on any lot of at least five acres.

Intervenors' application for the zone change was initially presented to the Jackson County Planning Commission (Commission). The evidence adduced at public hearings before the Commission (and eventually relied upon by the Board) established that the 70-acre parcel was held in the same ownership as the remainder of the farm and had been part of the commercial operation of the farm. It was separated from the rest of the farm by a state highway and served as a spring grazing area for 30 to 60 days each year. It was also used as a winter feed area to keep the farm's livestock off the lower-lying pastures during the wet season. The person who leased and operated the farm testified that if the 70 acres were not available for those purposes, he would either have to lease additional land or take some of the remainder of the farm out of row crop production.

There was evidence prepared by the planning staff that approximately 55 percent of the 70 acres consisted of the kinds of soil in capability classifications I-IV. There was also evidence, however, that due to the excessive slope of the land only 15 percent was suitable for agricultural production and that the

70-acre parcel by itself could not be profitably farmed, despite the soil classifications.

Because of doubts concerning the application of LCDC Goal 3 and the need for the rezoning, the Commission was unable to reach a consensus on the zone change application. The matter was referred to the Board with recommendations both to approve and to reject the zone change. The Board took additional testimony from the county soil scientist concerning the capability classification system and the procedure utilized in classifying the soils of the 70-acre tract. After hearing his testimony and reviewing the evidence presented before the Commission, the Board expressed skepticism with regard to the map prepared by the planning staff that indicated the soil classifications. In particular, the Board members were concerned about the reliability of the procedure used in preparing the map and were not satisfied that the capability classification system adequately reflected the significance of the actual slope of the land. The Board concluded that regardless of the fact that the soil classification map showed predominantly Class I-IV soils, the slope prevented the parcel's being profitably farmed. Therefore, the Board (erroneously) deduced the soils must not be predominantly in capability Classes I-IV. The Board also concluded that the tract was not necessary to permit farm practices on adjacent or nearby lands, because land could be leased to substitute for the 70 acres in the operation of the farm. Based upon those conclusions, the Board ruled that LCDC Goal 3 (*infra,* p 66) was inapplicable. Finding a public need for the zone change, the Board approved intervenors' application.

LCDC vacated the zone change, concluding (1) that the Board, being skeptical of the only available information directly bearing on the capability classifications of the soils, should have obtained more detailed and reliable information concerning capability classifications before turning to more general evidence

concerning the suitability of the land for farm use; and (2) that where a land use decision is to be made with regard to a tract which is held in common ownership with adjacent farmland and is utilized in a farming enterprise on that land, the parcel should not be viewed separately from the farm as a whole in determining if it is agricultural land.

In addition to challenging those conclusions, intervenors assert that the statutory scheme to establish LCDC and grant it authority to establish state-wide land use planning goals (*see generally* ORS ch 197) delegates legislative power in violation of Article III, section 1, and Article IV, section 1 of the Oregon Constitution. They also argue that the scope of Goal 3 is dependent upon the actions of an agency of the United States Government, in violation of Article I, section 21 of the Oregon Constitution. Finally, they would have this court hold that by defining "agricultural land" in Western Oregon conclusively to include lands composed predominantly of Class I-IV soils and by mandating that all such lands be placed in Exclusive Farm Use zones, LCDC has exceeded its statutory authority.

### Constitutional and Statutory Issues

The issues concerning LCDC's authority can be answered briefly, taking the last first.

### 1. Statutory Authority

■ Intervenors' argument that Goal 3 exceeds LCDC's statutory authority is based on the premise that it *requires* all lands in Western Oregon consisting predominantly of Class I-IV soils to be placed in EFU zones. Assuming, for the sake of argument, that such a requirement would exceed LCDC's authority, Goal 3, taken together with the other goals, is not so inflexible. For example, land within urban growth boundaries may not be governed by the requirement. Land consisting predominantly of Class I-IV soils which is irrevocably committed to non-farm use by adjacent

development may be zoned for non-farm uses under Goal 2 exception procedures. *1000 Friends of Oregon v. Marion County,* LCDC Opinion and Order No. 75-006 (March 2, 1977). Furthermore, Goal 3 mandates that agricultural land be placed in exclusive farm use zones only if that is "consistent with existing [and future] needs for agricultural production, forestry and open space." *1000 Friends v. Benton County,* 32 Or App 413, 426, 575 P2d 651 (1978). We have also said that a finding of predominance of Class I-IV soils does not necessarily require EFU zoning if there is a finding based upon substantial evidence that the land cannot presently or in the foreseeable future be utilized for "farm use" as defined in ORS 215.203. *1000 Friends v. Benton County, supra.* Finally, land that is included within an EFU zone pursuant to Goal 3 may be used for certain non-farm purposes in accordance with the variance provisions of ORS 215.213.

■ Intervenors' argument that Goal 3 exceeds LCDC's statutory authority is also based on another fallacious premise. They rely on ORS 197.230(1)(d), which directs LCDC to

> "[d]esign goals to allow a reasonable degree of flexibility in the application of goals by state agencies, cities, counties and special districts."

That statute was enacted in 1977 and is inapplicable to Goal 3.[1]

We conclude that the Goal 3 requirements are consistent with LCDC's statutory authority.

2. Delegation

■ Intervenors' arguments that the statutory scheme is unconstitutional in that it delegates legislative

---

[1] Goal 3 was promulgated in December, 1974, with an effective date of January 1, 1975. OAR 666-15-000, Appendix A. ORS 197.230(1)(d) was enacted as Oregon Laws 1977, ch 664, § 17. Section 18 of ch 664 provided:

"The amendment to ORS 197.230 by section 17 of this 1977 Act shall only apply to new goals adopted or revisions of existing goals made by the commission after the effective date of the 1977 Act, based on the prospective application of statutes."

power to LCDC and, in effect, to an agency of the United States Government are untenable. The delegation of legislative authority to an administrative agency does not violate the Oregon Constitution. The test for the validity of a delegation is

"* * * whether the practical necessities of the efficient administration of legislative policy requiring the delegation of discretion outweigh the danger of discriminate [sic] action." *Horner's Market v. Tri-County Trans.,* 256 Or 124, 132-33, 471 P2d 798 (1978).

In *Warren v. Marion County,* 222 Or 307, 313, 353 P2d 257 (1960), it was established that

"[t]here is no constitutional requirement that all delegation of legislative power must be accompanied by a statement of standards circumscribing its exercise. * * *"

The existence of *standards* is relevant in assessing the validity of delegation, but the existence of *safeguards* for those whose interests may be affected is determinative. *See Horner's Market v. Tri-County Trans., supra.* In this instance, there are both standards (*see* ORS ch 215) and safeguards. ORS 197.310(5).[2] Intervenors have made no showing that the provisions for judicial review of LCDC actions are inadequate. Indeed, this very case demonstrates the contrary.

Intervenors argue that by referring to the soil capability classification system of the U. S. Soil Conservation Service in defining "agricultural land," Goal 3 is in violation of Article I, section 21, of the Oregon Constitution. The legislature or an administrative agency may adopt a particular edition of a set of standards or a codification so long as future modifications or alterations by the agency or organization responsible for the standards are not automatically

---

[2] ORS 197.310(5) provides:

"Any party to a review proceeding before the commission who is adversely affected or aggrieved by the order issued by the commission in the matter may appeal the order of the commission in the manner provided in ORS 183.480 for appeals from final orders in contested cases."

included. *Seale v. McKennon,* 215 Or 562, 336 P2d 340 (1959); *Hillman v. North, Wasco Co. PUD,* 213 Or 264, 323 P2d 664 (1958). LCDC adopted the soil capability classification system only as it existed at the time of adoption. Subsequent changes in the system by the Soil Conservation Service would not be effective under Goal 3 unless specifically adopted by LCDC. Nothing suggests that LCDC has attempted to apply any such changes without adopting them in accordance with applicable procedure.

### *LCDC's Order*

LCDC Goal 3 relating to agricultural lands provides in material part:

"Agricultural lands shall be preserved and maintained for farm use, consistent with existing and future needs for agriculture products, forest and open space. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS ch 215. Such minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise within the area.

"* * * * *

"AGRICULTURAL LAND—in western Oregon is land of predominantly Class I, II, III and IV soils * * * as identified in the Soil Capability Classification System of the United States Soil Conservation Service, and other lands which are suitable for farm use taking into consideration soil fertility, suitability for grazing, climatic conditions, existing and future availability of water for farm irrigation purposes, existing land use patterns, technological and energy inputs required, or accepted farming practices. Lands in other classes which are necessary to permit farm practices to be undertaken on adjacent or nearby lands, shall be included as agricultural land in any event.

"More detailed soil data to define agricultural land may be utilized by local governments if such data permits achievement of this goal.

"* * * * *

"FARM USE—is as set forth in ORS 215.203 includes the non-farm uses authorized ORS 215.213."

In vacating the zone change, LCDC relied on two separate, related grounds. The first was that the Board should have sought more detailed or reliable data relating directly to the capability classification of the soil before concluding that the soil was not in Classes I-IV and was not suitable for farm use. We agree that in addressing Goal 3 the proper approach is first to determine on the basis of objective, scientific information the predominant soil capability classes in the relevant area. If that evidence indicates that soils in capability classifications I-IV predominate, then the presumption, at least, is that the land is agricultural. *1000 Friends v. Benton County, supra* 32 Or App at 432 (Schwab, C. J., specially concurring). If the evidence establishes that the soils are not predominantly Class I-IV, the governing body must then determine whether the land is nonetheless suitable for farm use or is necessary to permit farm practices to be undertaken on adjacent or nearby lands. If, as here, the governing body doubts the reliability of the data furnished it concerning soil capability classifications (in this instance Soil Conservation Service and planning staff maps), the proper course would be to seek more reliable information. LCDC was correct in saying that the first step should be a factual determination of the predominance of the soil capability classes according to the established standards. The Board did not, however, seek to obtain better data. Instead, it just refused to accept what was before it and made a contrary finding. It had no adequate basis for determining that the soils were predominantly in capability classifications above Class IV.[3]

---

[3] ORS 197.305 provides:

"* * * The commission shall not substitute its judgment for a finding solely of fact contained in the administrative record of any quasi-judicial proceeding for which there is substantial evidence in the whole record."

■ Even if the soils are predominantly in Classes I-IV, Goal 3 does not necessarily require that the land be preserved and maintained for agricultural use. In *1000 Friends v. Benton County, supra,* we noted that "Goal 3 must be read in context with the definition of 'farm use' in ORS 215.203 * ;* *." 32 Or App at 424.[4] In his concurring opinion, Chief Judge Schwab pointed out that

"[t]he reference in ORS 215.203 to the profitability of agricultural land probably means that it is not mandatory that agricultural land within the meaning of Goal 3

■

Intervenors argue that LCDC has violated that provision by overruling the Board's decision that the lands did not consist predominantly of soils in Classes I-IV. LCDC's order, however, was concerned with the procedure employed by the Board in addressing the soil classification issue; LCDC did not substitute its judgment on a factual question. Moreover, it appears that the Board's finding was not supported by substantial evidence in the whole record.

[4] ORS 215.203(2) provides:

"(2)(a) As used in this section, 'farm use' means the *current employment of land* including that portion of such lands under buildings supporting accepted farming practices *for the purpose of obtaining a profit in money* by raising, harvesting and selling crops or by the feeding, breeding, management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honeybees or for dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof. 'Farm use' includes the preparation and storage of the products raised on such land for man's use and animal use and disposal by marketing or otherwise. It does not include the use of land subject to the provisions of ORS chapter 321, or the construction and use of dwellings customarily provided in conjunction with the farm use.

"(b) 'Current employment' of land for farm use includes (A) land subject to the soil-bank provisions of the Federal Agricultural Act of 1956, as amended (P.L. 84-540, 70 Stat. 188); (B) land lying fallow for one year as a normal and regular requirement of good agricultural husbandry; (C) land planted in orchards or other perennials prior to maturity; and (D) any land constituting a woodlot of less than 20 acres contiguous to and owned by the owner of land specially assessed at true cash value for farm use even if the land constituting the woodlot is not utilized in conjunction with farm use.

"(c) As used in this subsection, 'accepted farming practice' means a mode of operation that is common to farms of a similar nature, necessary for the operation of such farms *to obtain a profit in money,* and customarily utilized in conjunction with farm use." (Emphasis supplied.)

[ 68 ]

be zoned for farm use if a county determines that the land cannot presently or in the foreseeable future be farmed profitably by any reasonable and prudent farmer * * * and that determination is supported by substantial evidence. * * *" 32 Or App at 432.

Thus, when the land in question is properly determined not to consist predominantly of Class I-IV soils, the governing body must consider further whether the land is nonetheless suitable for farm use (as defined in ORS 215.203). When the land is properly determined to consist predominantly of soil in Classes I-IV, the cross-reference to ORS 215.203 suggests that the governing body may nevertheless consider whether or not the land is suitable for farm use in that it can or "cannot presently or in the foreseeable future be farmed profitably by any reasonable and prudent farmer." 32 Or App at 432.

■ There was evidence from which the Board could have found that the 70-acre parcel, viewed separately from the rest of the farm, could not be an economically profitable farm unit. Reading the Board's order in its entirety, it would be fair to conclude that they did so find. In the absence of an appropriate finding as to soil capability, the issue of suitability for farm use was not properly before the Board.

■ Even if there had been a proper finding regarding the soil capability classes, however, the Board's finding regarding the suitability of the land for farm use reflects a fundamental error. LCDC's second ground was that the 70-acre parcel, which was adjacent to and held in common ownership with the rest of the farm, and which was utilized in the commercial operation of the farm, should not be considered as if it were an isolated tract. We agree.

■ LCDC Goal 3 and the agricultural land use provisions of ORS ch 215 are aimed very clearly, *inter alia,* at the preservation of existing commercial farming operations. ORS 215.243 provides:

"The Legislative Assembly finds and declares that:

"(1) Open land used for agricultural use is an efficient means of conserving natural resources that constitute an important physical, social, aesthetic and economic asset to all of the people of this state, whether living in rural, urban or metropolitan areas of the state.

"(2) The preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's economic resources and the preservation of such land in large blocks is necessary in maintaining the agricultural economy of the state and for the assurance of adequate, healthful and nutritious food for the people of this state and nation.

"* * * * *."

ORS 215.203(2)(a) provides in material part:

"As used in this section, 'farm use' means the *current employment of land * * * for the purpose of obtaining a profit in money * * *.*" (Emphasis supplied.)

Although it might not by itself be an economically profitable farming unit, the 70-acre parcel has been employed as part of a profit-capable farming operation. Considered as such, it is within the definition in ORS 215.203. *Cf. Rutherford v. Armstrong,* 31 Or App 1319, 572 P2d 1331 (1977), *rev den,* 281 Or 431 (1978).[5]

---

[5] In *Rutherford v. Armstrong,* 31 Or App 1319, 572 P2d 1331 (1977), *rev den,* 281 Or 431 (1978), we held that a five-acre parcel of land which was not in itself an economically profitable farming unit was "generally suitable * * * for the production of farm crops and livestock" and therefore could not be put to non-farm use under the variance provisions of ORS 215.213(3). That section provides:

"(3) Single-family residential dwellings, not provided in conjunction with farm use, may be established, subject to the approval of the governing body of the county, in any area zoned under ORS 215.010 to 215.190 and 215.402 to 215.422 for farm use upon a finding by the governing body that each such proposed dwelling:

"(a) Is compatible with farm uses described in subsection (2) of ORS 215.203 and is consistent with the intent and purposes set forth in ORS 215.243; and

"(b) Does not interfere seriously with accepted farming practices, as defined in paragraph (c) of subsection (2) of ORS 215.203, on adjacent lands devoted to farm use; and

"(c) Does not materially alter the stability of the overall land use pattern of the area; and

■ We find LCDC's order improper insofar as it purported to remand the matter to the Board for reconsideration consistent with the LCDC opinion. LCDC had the authority to vacate the zone change, but it had no authority to remand for reconsideration. *Board of Comm. of Clackamas County v. LCDC,* 35 Or App 725, 582 P2d 59 (1978).

Affirmed in part; reversed in part.

---

"(d) Is situated upon generally unsuitable land for the production of farm crops and livestock, considering the terrain, adverse soil or land conditions, drainage and flooding, vegetation, location and size of the tract; and

"(e) Complies with such other conditions as the governing body of the county considers necessary."

We noted that

"* * * there is no evidence in the record that the subject five-acre parcel cannot be sold, leased or by some other arrangement put to profitable agricultural use." 31 Or App at 1324.

ORS 215.213 is not directly involved here. Were we to accept the approach taken by the Board in considering the 70-acre parcel separately from the rest of the farm, however, the effect would be the same as the granting of a variance under ORS 215.213(3), but without the fulfillment of the stringent requirements of that section.