Argued and submitted December 17, 1979, reversed March 17, 1980

HILLCREST VINEYARD, et al,
*Appellants,*

*v.*

BOARD OF COMMISSIONERS OF
DOUGLAS COUNTY, et al
*Respondents,*
*and*
BROYHILL, et al,
*Intervenors-Respondents.*

(No. E78-0966, CA 14958)

608 P2d 201

Richard P. Benner, Portland, argued the cause and submitted the briefs for appellants.

No appearance for respondent Douglas County.

Dudley C. Walton, Roseburg, argued the cause for intervenors-respondents. On the brief was James G. Richmond, Roseburg.

Before Buttler, Presiding Judge, and Gillette and Roberts, Judges.

GILLETTE, J.

**GILLETTE, J.**

In this writ of review proceeding, petitioners challenge a circuit court order affirming a decision by the Douglas County Board of Commissioners (Board) approving a proposed subdivision plan. In spite of the fact that the soils in the area to be subdivided are predominately Class III and IV, the Board concluded that the land in question did not have to be preserved as farm land pursuant to statewide planning Goal 3 of the Land Conservation and Development Commission (LCDC) because it could not be farmed profitably and zoning it as exclusive farm use would not be consistent with existing needs for agricultural production, forestry or open space. We reverse.

The land in question is located in a rural area of Douglas County, consists of 119 acres and is zoned Rural Residential. The proposal is for 34 lots, 2 1/2 acres to 5.6 acres in size. Such a development would be consistent with its present zoning.

In June, 1977, intervenors Broyhill and Flury applied for preliminary plan approval. The Douglas County Planning Commission held public hearings on the application and members of the Commission viewed the land in question. Subsequently, the Planning Commission voted to approve the preliminary plan for the area, to be known as "High Mesa Estates Subdivision."

In October, 1977, plaintiff Sommer filed a notice of appeal with the defendant Board, challenging the Planning Commission's decision. After reviewing the decision on the record, the Board upheld the Planning Commissioner's action. In March, 1978, the Board entered its findings and conclusions.

Plaintiffs then filed a writ of review in the circuit court. The court entered a memorandum and order concluding that the Board's findings as then written were not adequate to support its approval of the subdivision. The case was remanded for further findings.

The Board entered supplementary findings and its order was affirmed by the circuit court. This appeal followed.

There is no dispute as to the physical characteristics of the land. It is predominately Class III and IV soil, placing it within the Goal 3 definition of agricultural land. General topography is rolling land with sloping and occasional pitches and canyons. The terrain is rough and brushy and the natural vegetation on the property is second growth fir, oak, madrone, brush and grass.

The zoning of surrounding property is forest recreation, general agriculture, and agriculture, grazing and timber. Use of the surrounding property varies from large parcels in various degrees of agricultural or forestry utilization to smaller parcels used primarily as rural homesites. To the north there is a cattle grazing operation and to the west is open grazing land. Directly south and east there are small acreage homesites varying in size from 5 to 20 acres. Vineyards are located nearby.

The former owners of the property under discussion here raised sheep on the property but abandoned the operation as unprofitable. The adjacent landowner to the north testified that she tried to purchase the land in question for grazing and rented it one year for that purpose. Two qualified livestockmen testified that too great an investment would be required to make the tract significantly productive. Both specifically considered the size of the parcel in arriving at their conclusion.

Despite the fact that the predominately Class III and IV soils found on the parcel place it within the Goal 3 definition of agricultural land, the Board concluded that approval of the subdivision did not violate Goal 3 because:

"(1) The land cannot presently or in the foreseeable future, be farmed profitably by any reasonable and prudent farmer;

[288]

"(2) Zoning the land as exclusive farm use is not consistent with existing needs for agricultural production, forestry or open space;

"(3) Exclusive farm use zoning is not needed to protect any farm use on adjacent or nearby land; * * *
" * * *"

We hold that the findings of fact made by the Board do not support conclusions (1) and (2) in that the Board's findings do not indicate that the Board considered possible agricultural uses of the land other than grazing.

In support of its conclusion that the land cannot be profitably farmed, the Board cited the following:

"(1) The subject tract is 119 acres in size,

"(2) It is brushy, rough terrain with bluffs and canyons,

"(3) It is largely unfenced,

"(4) It is located next to rural residential development, and

"(5) The testimony of qualified livestock men who said that too great an investment would be required to make the tract productive."

In support of its conclusion that the land need not be preserved for exclusive farm use because such is not consistent with existing needs for agricultural production, forestry or open space, the Board made the following findings:

"(1) The physical characteristics of the land as above enumerated which restrict its productivity of agricultural products is insignificant as we have found from the testimony of Ware and Moore above.

"(2) The testimony of Thomasson and the Wert Report as to the forestry site type of this land. This testimony was undisputed to the effect that the subject tract was a low potential yield forestry site because of drainage and rainfall. This fact is further supported by the Viewer's Report where George Fenn reported that a growth ring count of stumps showed the 'extreme slow growth in the area'. We believe this testimony and so find.

[289]

"(3) The tract was abandoned by the former owner for any agricultural use as unprofitable and is not currently being used for anything.

"(4) A substantial portion of the land surrounding this area is already in use as small acreage homesites, therefore, there is no need to single out this tract for open space. See maps and photograph exhibits.

"(5) To the contrary, the need for the type of well developed plan here proposed is great. The witness, Greg Farrell testified that there has not been a plat of this kind in Douglas County, which he has been called to examine for septic system approval, for three years before July, 1977, the time of the hearing before the Planning Commission. This testimony is undisputed. We believe it and so find.

"(6) The Oregon Court of Appeals held in *1000 Friends of Oregon v. Benton County*, [32 Or App 413, 575 P2d 651 (1978), *rev den*, by opinion, 284 Or 41 (1978)] *supra*, 426:

" 'However, contrary to petitioners' position, Goal 3 does not mandate that all agricultural lands be preserved and maintained for farm use and eventually placed in exclusive farm use zones. The goal requires that such action be taken "consistent with existing needs for agricultural production, forestry and open space." '

"We understand this holding to be an application of common sense to literal language of Goal 3. We believe this isolated 119 acres of the character, we have previously found, is exactly the kind of parcel to which the Court of Appeals referred."

Petitioners contend that both the Board and the circuit court misapplied Goal 3 as interpreted by this court in *1000 Friends v. Benton County*, 32 Or App 413, 575 P2d 651 (1978), *rev den,* by opinion, 284 Or 41 (1978), and *Meyer v. Lord*, 37 Or App 59, 586 P2d 367 (1978), *rev den*, 286 Or 303 (1979). They claim that there is a presumption that agricultural land with a soil classification of Class III or IV is land which can be profitably farmed. They argue that the Board erred in its conclusions because: (1) it failed to consider other

[290]

uses for the land besides grazing; (2) it failed to consider whether the land would be profitable farm land when considered in conjunction with other land; (3) it failed to apply the test set out in *1000 Friends* and *Meyer, i.e.,* that is, what a reasonably prudent farmer could do objectively; and (4) it did not explain why its findings lead to the conclusion that the land cannot be profitably farmed. Alternatively, they urge us to abandon the profitably test adopted by *1000 Friends* and *Meyer* and hold that the definition in Goal 3 is exclusive.

We decline to abandon the profitability test. In light of legislative action in the land use area and the new Land Use Board of Appeals established by the 1979 Legislature, "we believe the LCDC can deal adequately with any abuses * * * in the event that this court has misconstrued * * * Goal 3." *Meeker v. Board of Commissioners,* 287 Or 665, 678, 601 P2d 804 (1979). We turn to petitioners' evidentiary claims.

The purpose of Goal 3 is to preserve and maintain agricultural lands. Goal 3 states:

> "Agricultural lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS Chapter 215. Such minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise within the state."

Agricultural land is defined as:

> "AGRICULTURAL LAND—in western Oregon is land of predominately Class I, II, III and IV soils and in eastern Oregon is land of predominately Class I, II, III, IV, V and VI soils as identified in the Soil Capability Classification System of the United States Soil Conservation Service, and other lands which are suitable for farm use taking into consideration soil fertility, suitability for grazing, climatic conditions, existing and future availability of water for farm irrigation purposes, existing land use patterns, technological and energy imputs required, or accepted farming

practices. Lands in other classes which are necessary to permit farm practices to be undertaken on adjacent or nearby lands, shall be included as agricultural land in any event."

Chapter 215 of the Oregon Statutes provides for the establishment of farm use zones. The definition of "farm use" is as set forth in ORS 215.203 and includes the non-farm uses authorized by ORS 215.213. ORS 215.203 provides in part:

"(1) Zoning ordinances may be adopted to zone designated areas of land within the county as exclusive farm use zones. Land within such zones shall be used exclusively for farm use except as otherwise provided in ORS 215.213. Farm use zones shall be established only when such zoning is consistent with the comprehensive plan.

"(2) (a) As used in this section 'farm use' means the current employment of land including that portion of such lands under buildings supporting accepted farming practices for the purpose of obtaining a profit in money by raising, harvesting and selling crops or by the feeding, breeding, management and sale of, or the produce of, livestock, poultry, furbearing animals or honeybees or for dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof. 'Farm use' includes the preparation and storage of the products raised on such land for man's use and animal use and disposal by marketing or otherwise. It does not include the use of land subject to the provisions of ORS chapter 321, except land used exclusively for growing cultured Christmas trees as defined in subsection (3) of this section, or to the construction and use of dwellings customarily provided in conjunction with the farm use."[1]

In *1000 Friends, supra,* this court rejected the notion that, if lands are within the farm land soil classifications of Goal 3, they must automatically be zoned or be preserved for zoning for exclusive farm use. We said:

---

[1] This section was amended by Or Laws 1979, ch 480, § 1, to add that the use in question must be for the "primary" purpose of obtaining a profit in money.

"Goal 3 does not mandate that all agricultural lands be preserved and maintained for farm use and eventually placed in exclusive farm use zones. The goal requires that such action be taken 'consistent with existing needs for agricultural production, forestry and open spaces.'" *Id.,* at 426-427.

In addition, Goal 3 must be read in the context with the definition of farm use in ORS 215.203(2)(a). Thus, Goal 3 is to be addressed "if any of the lands are capable, now or in the future of being currently employed for agricultural production for the purpose of obtaining a profit in money." *Ibid. Accord, Meyer v. Lord, supra,* at 69.

A finding that "land cannot presently or in the foreseeable future be utilized for farm use as defined in ORS 215.203" must be based on substantial evidence. *Id.,* at 64. The question to be decided is whether the Board's findings support their conclusion that the land in question cannot be profitably farmed. They do not.

The Board in its findings did not specifically address possible farm applications other than grazing. This was error. There was evidence offered to suggest that the land was suitable for raising grapes. The petitioner Sommer does precisely that on nearby land. The Board may not *believe* that grapes may be raised profitably on the parcel; assuming evidence both ways, that would be a judgment to which we would defer. But, until the Board has addressed the question directly, we cannot say it has fully performed its duty under Goal 3 and ORS chapter 215. *See Norvell v. Portland Area LGBC,* 43 Or App 849, 853-854, 604 P2d 896 (1979). This failure to address evidence concerning an alternative agricultural use for the property undermines both the conclusion that the land cannot presently be farmed properly and the conclusion that zoning the land for exclusive farm use is not consistent with existing agricultural needs. It follows that the trial court's order in this case must be reversed and the

case remanded with instructions to remand the case to the Board for further consideration under Goal 3.

Reversed and remanded.[2]

---

[2] The parties raise and argue other issues. However, inasmuch as the case is being remanded and a new appeal, if any, would be considered by the newly-constituted Land Use Board of Appeals, we decline to extend our decision beyond the matters discussed above. *See Norvell v. Portland Area LGBC, supra.*